**Ronney Lee SNYDER, Petitioner–Appellant,**

v.

**George SUMNER, et al., Respondent–Appellee.**

**No. 90–16335.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1991.

Decided April 3, 1992.

James E. Mayberry, Las Vegas, Nev., for petitioner-appellant.

Robert Wieland, Deputy Atty. Gen., Carson City, Nev., for respondent-appellee.

Before: TANG and TROTT, Circuit Judges, and BURNS,* District Judge.

TROTT, Circuit Judge:

Pursuant to a detainer filed under the Interstate Agreement on Detainers Act

---

* The Honorable James M. Burns, Senior United States District Judge for the District of Oregon, sitting by designation.

("IADA"), 18 U.S.C. app. II, § 1 et seq. (1988); Nev.Rev.Stat. § 178.620 (1991) [all following cites will be to the United States Code only], Ronnie Lee Snyder ("Snyder") was released from an Iowa prison to Nevada to stand trial on criminal charges. He was held in Nevada for 426 days before his trial began. In this appeal from a denial of his petition for a writ of habeas corpus, Snyder asserts his right under the IADA to have been brought to trial within 120 days of his arrival in Nevada. Nevada claims—as it did successfully in district court—that because Snyder was formally paroled by Iowa on the 120th day after his arrival in Nevada, the IADA requirements do not apply. In the alternative, the state argues that even if the IADA rules did apply, only 112 days of Snyder's 426 day incarceration in Nevada pending trial would be attributable to the state; thus bringing him to trial within the statutory limit. We have jurisdiction under 28 U.S.C. § 2253 (1988), and we reverse and remand.

## I

### Facts and Procedure

Based on pending felony charges, Nevada filed a notice of detainer against Snyder while he was imprisoned in Iowa. Pursuant to that detainer, and Snyder's response, he was transferred to Nevada on December 3, 1984 to stand trial on charges of burglary, larceny, and grand larceny auto. One hundred twenty days after Snyder arrived in Nevada, and while he was still awaiting trial, Iowa formally placed him on parole. Snyder's trial began on February 3, 1986, 426 days after his arrival, over his objection that he had not been brought to trial within 120 days. Snyder was convicted and sentenced to 10 years for burglary, 15 years for robbery, a consecutive term of 15 years for use of a deadly weapon, and a consecutive term of 10 years for grand larceny of an automobile.

When Snyder appealed to the Nevada Supreme Court, he raised four claims of error, two of which he raises in this petition: (1) that the state violated his right to be brought to trial within 120 days as required by the IADA; (2) that the state denied his right to an effective appeal because necessary parts of the record had been lost.

The Nevada Supreme Court affirmed the judgment of the trial court. *Snyder v. State,* 103 Nev. 275, 738 P.2d 1303 (1987). The court found that there had been seven separate delays, six of which were attributable to Snyder, and held that 112 days (consisting of two 56 day periods) were caused by the state. It concluded that the 120-day limit established by the IADA had not been exceeded or violated.

The period of time between Snyder's arrival in Nevada and his trial can be outlined as follows: First, 56 days passed prior to the first date set for trial. These 56 days are attributable to the state and are not contested. Thereafter, Snyder's time before trial can be parsed into seven periods of delay caused by various continuances.

(1) Snyder filed a state writ of habeas corpus on January 16, 1985. On January 23, 1985, at the request of the public defender, the case was continued to February 4, 1985 (a seven-day delay from the original trial date of January 28, 1985). On February 4, 1985, the court continued the ruling on the habeas writ until February 11, 1985 (a second seven-day delay). On February 11, 1985, Snyder filed a pro se motion for a new attorney—a two-day delay. On February 13, 1985, the habeas writ was scheduled to be heard, and the motion for a new attorney was held in abeyance. Trial was then set for April 22, 1985 (a 68-day delay). The total delay to this point was 84 days. The district court held that this entire delay was caused by Snyder and did not count against the 120-day limit. Snyder contests this holding.

(2) A 36-day delay, caused by the prosecution's involvement with a murder trial, was agreed to by Snyder, and thus does not count against the 120-day limit. The district court so held and this holding is not contested.

(3) On May 28, 1985, the court granted a continuance ostensibly for plea bargaining negotiations. Status checks were held on July 1, 1985 (a 34-day delay), and July 3,

1985 (a two-day delay). The court was then told that the plea negotiations had fallen through, and a continuance was granted until July 8, 1985 (a five-day delay). At this hearing, the trial was set for August 26, 1985 (a 49–day delay). The total delay in this third period was 90 days. The district court attributed the entire delay to Snyder and held that these days did not count against the 120–day limit. This holding is contested by Snyder.

(4) The trial was reset for September 9, 1985, due to a scheduling conflict of Snyder's counsel. This 14–day delay was attributable to Snyder and does not count against the 120–day limit. Snyder does not contest this holding.

(5) A continuance was granted to November 4, 1985, to allow Snyder's counsel to respond to the state's pre-trial motions and a habitual criminal allegation. This 56–day delay was attributable to the state. It counts against the 120–day limit and is not contested.

(6) A continuance of 49 days was granted due to defense counsel's illness. This delay was attributable to Snyder and is not contested.

(7) A final continuance to February 3, 1986, was granted to allow defense counsel to locate witnesses. This 42–day delay was attributed to Snyder and is not contested.

Snyder filed a writ of habeas corpus in federal district court, alleging that he was denied his right under the IADA to trial within 120 days of arrival in the receiving state (Nevada).

In their opening and answering briefs before the district court, both Snyder and the state addressed only the question of proper attribution for each of the seven delays. However, in the Respondent's Reply to the Petitioner's Opposition to Motion to Vacate Evidentiary Hearing, the state for the first time argued that the IADA was not violated because Snyder had been paroled from his Iowa sentence on April 2, 1985—exactly 120 days after his arrival in Nevada.

The magistrate agreed with the state and held that because Iowa had put Snyder on parole exactly 120 days after his arrival in Nevada, the 120–day limit was no longer applicable. The parole in effect voided the IADA requirements. The magistrate then vacated his order granting a scheduled evidentiary hearing on the writ.

Although the magistrate held that the parole issue was dispositive, he also ruled that the entire 56–day delay caused by Snyder's filing of the state habeas corpus petition was attributable to him. The magistrate did not decide the issue of who caused the plea negotiation delays. The district court adopted in full the findings of the magistrate.

The transcripts of the hearings concerning the plea negotiations held on May 15, May 28, July 1, and July 3, 1985, are missing. However, the magistrate agreed with the Nevada Supreme Court that the minutes for those hearings were sufficient to determine that the entire 90–day delay during this period was attributable to Snyder.

II

*Federal Statutory Framework*

The IADA is an agreement among 48 states—including Iowa and Nevada—whose purpose is to "encourage the expeditious and orderly disposition of [criminal] charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." 18 U.S.C. app. II, § 2, art. I. "A detainer is simply a document notifying one state (the sending state) that another state (the receiving state) wants to prosecute a prisoner that the sending state is holding." *Burrus v. Turnbo*, 743 F.2d 693, 696 (9th Cir.1984), *vacated as moot sub nom., Hijar v. Burrus*, 474 U.S. 1016, 106 S.Ct. 562, 88 L.Ed.2d 548 (1985); *see also Hopper v. United States Parole Comm'n*, 702 F.2d 842, 846 (9th Cir.1982) ("In the legislative history of the IADA, 'detainer' is defined as a 'notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.'") (citing H.R.Rep. No. 1018, 91st Cong., 2d Sess. 2 (1970), and S.Rep. No. 1356, 91st

Cong., 2d Sess. 2 (1970), *reprinted in* 1970 U.S.C.C.A.N 4864).

"Prior to the Agreement's development, a prisoner had neither the means to learn of the lodging of a detainer nor the concomitant right to effect speedy disposition of the out-of-state charges underlying the detainer." Christopher D. Cerf, Note, *Federal Habeas Corpus Review of Nonconstitutional Errors: The Cognizability of Violations of the Interstate Agreement on Detainers,* 83 Colum.L.Rev. 975, 978 (1983) [hereinafter, *Nonconstitutional Errors* ] (footnote omitted). The Ninth Circuit has opined on the several deleterious effects of detainers:

> First, it may make the prisoner ineligible for desirable work or educational assignments. If the prisoner is constantly shuttled from one facility to another, prison officials may be reluctant to permit him to participate in rehabilitation programs. Second, a detainer reduces the prisoner's incentive to participate in work, education, and other programs that help rehabilitate him and improve his chances for early parole. . . . Third, a detainer tells the prisoner that he may have to stand trial elsewhere, but does not provide him with a vehicle for going there immediately to secure witnesses and take other steps to preserve his defense.

*Burrus,* 743 F.2d at 696. The IADA prevents abuses by creating "a statutory grant of rights not fully protected by the due process and speedy trial provisions of the Constitution." *Nonconstitutional Errors, supra,* at 978 (footnotes omitted). Before the IADA, "some prison officials and state prosecutorial authorities abused the detainer system. Sometimes, authorities in potential receiving states lodged detainers not to obtain prisoners for the purpose of putting them on trial, but instead to make life more difficult for them in the prisons where they were already incarcerated." *Burrus,* 743 F.2d at 697. The IADA specifically prevents such abuses.

The instant case is governed by Article IV(c) of the IADA:

> In respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

18 U.S.C. app. II, § 2, art. IV(c). This section mandated that Snyder's trial in Nevada (the receiving state) begin no later than 120 days after his arrival.

### III

#### Standard of Review

"The IAD[A] is an interstate compact approved by Congress and thus is a federal law within the meaning of [28 U.S.C.] § 2254." *Brown v. Wolff,* 706 F.2d 902, 905 (9th Cir.1983) (citing *Cuyler v. Adams,* 449 U.S. 433, 438, 101 S.Ct. 703, 706, 66 L.Ed.2d 641 (1981)). Such nonconstitutional claims have been held to be cognizable under 28 U.S.C. § 2254 by the Ninth Circuit. *Brown,* 706 F.2d at 905 (citing *Cody v. Morris,* 623 F.2d 101, 102–103 (9th Cir. 1980)).

"We review de novo a petition for habeas relief . . . based on an alleged violation of the IAD[A]." *Johnson v. Stagner,* 781 F.2d 758, 761 (9th Cir.1986) (citing *Hudson v. Moran,* 760 F.2d 1027 (9th Cir.), *cert. denied* 474 U.S. 981, 106 S.Ct. 387, 88 L.Ed.2d 339 (1985)).

### IV

#### Applicability of the IADA to Paroled Prisoners

■ We must first decide whether the state should be estopped from raising the issue of whether IADA rules apply in the instant case. The state never raised the issue in the state proceedings and first broached it in a reply brief in federal district court. An issue not presented to the trial court generally cannot be raised on appeal. *United States v. Flores–Payon,* 942 F.2d 556, 558 (9th Cir.1991). However, an issue may be heard for the first time on appeal "when plain error has occurred and

an injustice might otherwise result." *Id.* (citation omitted).

■ In the instant case, we need not determine if it would be plain error on the prosecution's part to ignore the fact that Snyder was paroled 120 days after his arrival in Nevada, for we hold that the parole status of a prisoner, after he is sent to the receiving state, does not affect the applicability of the IADA.[1]

■ The issue here is whether the IADA continues to apply to a prisoner when he or she is paroled from the sending state while awaiting trial in the receiving state. We hold that once the defendant has been received by the receiving state, the 120–day clock starts to run and cannot be turned off by a grant of parole by the sending state.

Based on *United States v. Black,* 609 F.2d 1330 (9th Cir.1979), *cert. denied* 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 56 (1980), the district court decided that the IADA no longer applied when Snyder was paroled. *Black,* however, is distinguishable from the instant case. In *Black,* the defendant was convicted in state court and then released on detainer to federal prison in 1973 to await a trial on federal charges. *Id.* at 1332. The defendant in *Black* pled guilty to the federal charges and was then sentenced to serve his federal sentence consecutively with the state term. *Id.* He was paroled from the state sentence and sent to federal prison to serve his sentence. *Id.* In 1977, his federal guilty plea and sentence were vacated and he was released on bail, pending retrial of the federal charges. *Id.* at 1333. While free on bail, he again violated state law. He was sent to state jail, and his federal bail was revoked. The defendant claimed the federal detainer filed in 1973 was still applicable because he was being tried for the same federal charges. *Id.* The Ninth Circuit held that "[t]he provisions of the IAD[A] were satisfied upon [the defendant's] return to state custody after [the original] disposition of the federal charges." *Id.* at 1334.

The instant case is different. In *Black* the defendant lost his IADA rights because he was sent to the receiving state to serve a sentence already imposed. Unlike the defendant in *Black,* Snyder was awaiting trial in the receiving state (Nevada) when he was paroled by the sending state (Iowa). Consequently, when Snyder was sent to Nevada, he remained protected by the IADA because Nevada remained a receiving state under the IADA. If the IADA were to apply to the defendant in *Black,* the sending state and the receiving state would have to be seen as switching roles with regard to the defendant, thereby rendering irrelevant any detainer filed while the two states occupied their previous roles. *Id.* at 1333–34.

The rule that the IADA no longer applies when a prisoner is placed on parole in the sending state after he or she is sent to the receiving state would undermine the purpose of the IADA: to stem abuses in the handling of prisoners, and "to eliminate the needlessly punitive, arbitrary, and sometimes vindictive elements of the prior detainer system." *Nonconstitutional Errors, supra,* at 979 (footnotes omitted). The rule of the district court would give every receiving state a way to bypass the requirements of the IADA. A state could simply request that the sending state put the detained prisoner on parole on day 120. This is clearly the kind of abuse the IADA was intended to avoid. In the instant case, there is no evidence of collusion between the sending state (Iowa) and the receiving state (Nevada). However, we cannot help but note the extraordinary coincidence of Snyder's release on parole precisely on day 120. States cannot be allowed to undercut the IADA and its objectives by stopping the clock in this arbitrary way.

1. It is, in fact, unclear whether Snyder actually was paroled. The only item in the record that substantiates this fact is an unauthenticated letter to the appellees from the Iowa Parole Board dated January 5, 1990. Snyder has not challenged the authenticity of that letter. However, because we hold that Snyder's being placed on parole does not stop the clock as to his IADA rights, we need not reach the issue of whether Snyder waived challenging the evidence. Even assuming that Snyder was placed on parole in Iowa, he may still invoke his IADA rights.

**1454**

Equally important, the rule proposed in the district court goes against the plain language of the statute. According to the language of the IADA, the clock does not stop running except for the time explicitly excluded—that is "for good cause shown in open court." Otherwise the "trial *shall* be commenced within one hundred and twenty days." This language is mandatory.

■ Therefore, we conclude that when a prisoner is sent from one signatory of the IADA to another, the 120–day limit remains in effect unless an exception is justified by "good cause shown in open court, the prisoner or his counsel being present, [in which case] the court having jurisdiction of the matter may grant any necessary or reasonable continuance." 18 U.S.C. app. II, § 2, art. IV(d). The clock does not stop if the sending state places the prisoner on parole.[2]

## V
### Calculation of Snyder's 120–day IADA Period

■ Snyder contests two of the seven delays. The first delay was due to his assertion of his habeas corpus rights.[3] This claim is easily dismissed. The federal magistrate noted that it was Snyder's counsel who required that the court continue his case until February 4, 1985, for a status check on the writ and either dismissal or resetting of the trial. Because Snyder him-

self requested the continuance, he cannot dispute that this first delay is to be attributed to him. By requesting the continuance, he waived his right to a speedy trial. *See Brown v. Wolff,* 706 F.2d 902, 907 (9th Cir.1983) ("[a] prisoner may waive his IAD[A] rights ... if he affirmatively requests to be treated in a manner contrary to the procedures prescribed by the IAD[A]").

Snyder argues that he should not be penalized for the exercise of the writ. However, the case he cites for that proposition, *Stroble v. Egeler,* 408 F.Supp. 630 (E.D.Mich.1976), refers to the post-conviction remedy of the "Great Writ," *see id.* at 634, not a pretrial, statutorily created writ (which is the functional equivalent of a probable cause hearing).

■ Snyder also contests the third delay, which resulted from failed plea negotiations. This is a more difficult issue. Transcripts are missing from four hearings: May 15, 1985, May 28, 1985, July 1, 1985, and July 3, 1985. The district court adopted the reasoning of the Nevada Supreme Court, which ruled that the minutes of these hearings were a sufficient substitute. The Nevada Supreme Court wrote that

[t]he third continuance was granted on May 28, 1985, in Judge Goldman's chambers, and resulted in the trial date being reset for August 26, 1985, a delay of 90

2. Our holding distinguishes this case from *United States v. Reed,* 620 F.2d 709 (9th Cir.), *cert. denied* 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980), where the defendant's parole occurred prior to the time he was sent to the receiving state.

3. The state also argues that Snyder failed to raise the issue of the first continuance in state court. It is necessary to exhaust available and adequate state court remedies with respect to each claim contained in the petition. *Rose v. Lundy,* 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982); *see also Lindquist v. Gardner,* 770 F.2d 876, 877 (9th Cir.1985). However, the Supreme Court has recently stated that failure to exhaust state remedies does not necessarily deprive an appellate court of jurisdiction to consider the merits of a habeas petition. *Granberry v. Greer,* 481 U.S. 129, 134–35, 107 S.Ct. 1671, 1674–75, 95 L.Ed.2d 119 (1987). When exceptional circumstances arise that pre-

vent the state from raising the non-exhaustion argument in the district court,

it [is] appropriate for the court of appeals to take a fresh look at the issue. The court should determine whether the interests of comity and federalism will be better served by addressing the merits forthwith or by requiring a series of additional state and district court proceedings before reviewing the merits of the petitioner's claim.

*Id.* at 134, 107 S.Ct. at 1674. Comity and Federalism are not insulted when the claim is meritless and "does not raise even a colorable federal claim." *Id.* at 135, 107 S.Ct. at 1675. Moreover, "it is appropriate for the court of appeals to dispose of nonmeritorious petitions without reaching the nonexhaustion issue." *Id.* at 135 n. 7, 107 S.Ct. at 1675 n. 7. Because Snyder's claim concerning the first delay has no merit, we will affirm the district court on this issue and dispose of the claim.

days. Because the reporter's notes were lost, no transcript of the proceeding is available. Ronnie [Snyder] argues that because there is no transcript showing why the continuance was granted, and no specific finding of good cause by the district court, this time should not be counted against him. We disagree. The July 1, 1985 and July 3, 1985 minute entries clearly indicate that the May 28, 1985 hearing was continued for plea negotiations, which ultimately failed. *United States v. Odom,* 674 F.2d 228, 230 (4th Cir.1982), *cert. denied,* 457 U.S. 1125 [102 S.Ct. 2946, 73 L.Ed.2d 1341] (1982), found the defendant had undertaken a course of action inconsistent with the IAD[A] by bargaining for a plea. We hold the minute entries are sufficient evidence that the trial was continued for good cause.

*Snyder,* 738 P.2d at 1305 (footnote omitted). Originally, the magistrate in the federal district court granted a hearing to determine the issues surrounding the delays, but subsequently determined that the hearing was not necessary because the parole issue was dispositive, and, in addition, that the minutes were sufficient. We disagree.

The minutes (which amount to approximately six lines per missing day)[4], state for May 28, 1985, that the case was continued after a conference in chambers. No more detail is given. The minutes for July 1, 1985, and July 3, 1985, state that "negotiations fell through." This implies that the plea negotiations must have broken down between May 28th and July 1st.

Snyder claimed in his brief and during oral argument that no continuance was issued for negotiations. He avers that he immediately rejected the offer of a plea on May 28th and desired to go to trial. The minutes only show that a status check was scheduled for July 1. Nothing indicates that the plea negotiations continued for the intervening 34 days nor that the plea bargain was not immediately rejected.

After July 1, 1985—when it was noted that the plea negotiations had already broken down—it took the court seven more days to set a trial date: 49 more days passed before that trial date arrived. The record gives no adequate explanation to justify holding those 56 days against Snyder.

In a broadstroke ruling, the Nevada Supreme Court concluded that the entire delay could be attributed to plea negotiations. Even if the Court was correct in excluding the 34 days between May 28, 1985 and July 1, 1985, the remaining 56 days are not so easily dismissed. With an uncontested 112 days, the state was already just eight days shy of violating Snyder's IADA rights. As noted above, the IADA requires that any continuance be made with good cause shown in open court. Despite the Nevada Supreme Court holding, this court considers the short minutes of the hearings for which the transcripts are missing, by themselves, to be inadequate as evidence that Snyder's IADA rights were not violated.

The magistrate in this case initially doubted whether the record supported the conclusion that the whole delay was attributable to Snyder, and he ordered an evidentiary hearing. Only after the magistrate concluded that the parole issue was dispositive did he vacate the order for an evidentiary hearing.

In *Johnson v. Stagner,* this court required a remand to the district court, where "[t]he record is unclear concerning both the trial court's reasons for and the procedures it employed in granting the ... continuance." 781 F.2d 758, 763 (9th Cir. 1986). We must be able to determine whether the IADA clock stopped during one of the four hearings without transcripts to determine whether there was "good cause shown in open court, the prisoner or his counsel being present." 18 U.S.C. app. II, § 2, art. III(a). As in *Johnson,*

---

4. For example, the minutes for July 3, 1985 reads as follows:

State represented by James Miller, DDA. Deft. Snyder present in custody with Peter Chris-

tiansen, DPD, who requested matter be sent back to Dept. IV as negotiations fell through. COURT ORDERED, matter continued in Dept. IV.

[t]he determination of who was responsible for the ... continuance and how it came about is critical to the resolution of [the petitioner's] IAD[A] challenge. If [the petitioner] explicitly agreed to the continuance, our decisions suggest that he waived his rights under the IAD[A].... Conversely, if the continuance resulted from the state court's scheduling problems, our court and others have held that such problems do not constitute "good cause" for exceeding the IAD[A]'s time limits.

781 F.2d at 763.

The state argues that we should defer to factual findings of the Nevada Supreme Court, for "[i]n federal habeas corpus proceedings, deference must be granted to the findings of state appellate courts as well as state trial courts." *Neuschafer v. McKay,* 807 F.2d 839, 841 (9th Cir.1987) (citing *Wainwright v. Goode,* 464 U.S. 78, 85, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983); *Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981)). Title 28 U.S.C. § 2254(d) reads, in pertinent part, as follows:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, *shall be presumed to be correct, unless the applicant shall establish* or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

. . . .

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and *the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:*

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant ... *or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination,* the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

28 U.S.C. § 2254(d) (1988) (emphasis added). In the instant case, even if Snyder has not carried his burden, we hold that under section 2254(d), the record, considered as a whole, fails to support the factual determinations of the Nevada Supreme Court.

On this last ground, we remand to determine whether the continuance of the trial date for 90 days on May 28, 1985, was granted for good cause shown and was necessary or reasonable.

▪ Finally, Snyder argued that the record did not reflect that the continuance occurred in open court. This claim has no merit. As quoted above, the IADA requires that good cause for continuances must be "shown in open court." 18 U.S.C. app. II, § 2, art. IV(c). This requirement protects against ex parte or sua sponte proceedings. Under *Johnson v. Stagner,* the appellate court must remand to the district court if it "cannot tell whether the

continuance was granted following a proceeding in open court." 781 F.2d at 763, 764.

In *Johnson*—where remand was required in order to determine if the proceedings occurred in open court—the Ninth Circuit cited to *Stroble v. Anderson*, 587 F.2d 830, 839 (6th Cir.1978), in which the Sixth Circuit held that "open court" means a formal proceeding with a judge sitting "on the bench." *Johnson*, 781 F.2d at 763. The Fourth Circuit noted, however, that *Stroble*

> dealt with continuances granted by the clerk of the court and ultimately approved by a judge in the absence of defense counsel. The court had no occasion to decide whether the "open court" requirement is satisfied where a continuance is granted by a judge in chambers following adversarial proceedings attended by the defendant's counsel.

*United States v. Odom*, 674 F.2d 228, 231 (4th Cir.), *cert. denied* 457 U.S. 1125, 102 S.Ct. 2946, 73 L.Ed.2d 1341 (1982). We hold with the Fourth Circuit that the "open court" requirement does not mandate a formal proceeding. The minutes of the four continuances at issue show that counsel for both sides were present, as was the judge. This is sufficient to satisfy the "open court" requirement of the IADA.

## VI

### Conclusion

We hold that (1) the IADA applies to an incarcerated person, even if he is later placed on parole by the sending state; (2) exercise of a pre-trial statutorily created writ of habeas corpus does not stop the 120–day clock of the IADA; (3) remand is required to allow an evidentiary hearing that will determine whether the 90–day delay starting from May 28, 1985, is entirely attributable to Snyder; (4) the facts are sufficient to satisfy the "open court" requirement of the IADA.

REVERSED AND REMANDED.

JAMES M. BURNS, Senior District Judge, dissenting:

I cannot agree with the premature and broad-brush treatment of the "IADA-parole" issue in the majority opinion, which comes dangerously close to overruling *United States v. Black*, 609 F.2d 1330 (9th Cir.1979).

Disposition of this case at this juncture does not require us to reach and "decide" the issue of the relationship between the IADA and a grant of parole by the sending jurisdiction. In my view, we should remand to the district court for an evidentiary hearing on the third continuance of 90 days to determine whether any or all of that time was excludable; the number of excludable days was, after all, the core issue for both Snyder and the State. If the district court on remand were to find after a hearing that the time was excludable and Snyder was held in Nevada's custody pretrial for only 112 days attributable to the State, this conclusion would foreclose Snyder's claim that the 120–day maximum period prescribed by the IADA was exceeded. It would be unnecessary for us to consider the correctness of the district court's conclusion that the grant of parole voided the IADA 120–day requirement. If the district court were to find the 90 days were not excludable and restates its denial of Snyder's claim on the basis of Iowa's grant of parole, Mr. Snyder is free to bring his case back to this court (and, I would suggest, to this panel) to have that knotty question decided.

I respectfully dissent.