Robert Haden KING, Jr.,
Petitioner–Appellant,

v.

Neil BROWN, Superintendent, Clallam
Bay Corrections Center, Respondent–
Appellee.

No. 92–35471.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1993.

Decided Nov. 3, 1993.

Phillip M. Margolin, Margolin & Margolin, Portland, OR, for petitioner-appellant.

Robert M. Atkinson, and Robert B. Rocklin, Asst. Attys. Gen., Salem, OR, for respondent-appellee.

Michael E. Rose, American Civil Liberties Union, Portland, OR, for amicus.

Before: PREGERSON, KLEINFELD, Circuit Judges, and LEGGE, District Judge.*

KLEINFELD, Circuit Judge:

King was convicted in Oregon state court of "aggravated murder" and sentenced to life imprisonment with a minimum of thirty years to serve. The main issue on appeal is whether the State of Oregon was bound to a ten year minimum on a plea to ordinary murder because of a plea bargain it made with King. King also claims that his prosecution violated the Interstate Agreement on Detainers because the State of Oregon secured his release from the State of Washington with an invalid indictment. The district court dismissed King's petition for habeas corpus relief. We affirm.

## I. Facts.

A man named James Salter allegedly hired King to find a hit man to kill Salter's ex-wife Julie. The hit man, Hill, killed Mrs. Salter pursuant to King's arrangement. King and Hill were convicted, in separate trials, but Salter was acquitted.

King was initially indicted on March 5, 1982, while he was in the custody of the State of Washington. He was transferred to Oregon pursuant to the Interstate Agreement on Detainers. The State of Oregon took custody of King on November 20, 1982. With extensions agreed to by King, the State of Oregon initially had until April 18, 1983 to try King under the indictment. O.R.S. 135.-775, art. IV(c).

On April 11, 1983, King filed a motion to quash the March 5 indictment, asserting that the indictment was improperly obtained under the Article VII § 5(2) of the Oregon Constitution. This provision requires that a grand jury consist of seven jurors, five of whom must agree to indict. The grand jury initially did consist of seven jurors, but the prosecutor excused one of the seven. The other six unanimously indicted. The Oregon trial court granted King's motion to quash the indictment, holding that there was no "good cause" for excusing the juror.

On April 12, 1983, the state filed a motion for a thirty day continuance to allow for resubmission to the grand jury. The trial court found "good cause" for the continuance, and gave the state until May 15, 1983 to file a

---

* The Honorable Charles A. Legge, United States District Judge for the Northern District of California, sitting by designation.

new indictment. The court also denied King's motion to compel his return to the State of Washington.

On April 18, 1983, the state filed a second indictment. King was arraigned on the following day, and he filed a motion to dismiss for failure to try him within the time allowed under the Interstate Agreement on Detainers. The motion was denied.

King also objected to the state's second indictment on the ground that there was a substantial change in theory from the first indictment. On April 19, 1983, the prosecutor resubmitted the indictment on the original theory, and a third indictment was returned immediately. King's motion to quash or set aside this indictment was denied.

On August 3, 1983, King entered into a plea agreement with the State of Oregon. The agreement provides for ten year eligibility for parole in exchange for a guilty plea to murder, information, and testimony:

.  .  .  .  .

(2) The trial presently set for August 8, 1983 will be continued at the defendant's request. . . .

(3) The defendant will consent to be interviewed by officers of the state or their agents in the presence of defendant's counsel concerning all facts he knows about the death of Julie Ann Salter on September 23, 1980. The officers of the state or their agents will investigate those facts and present the results of the investigation to the state. The state will evaluate those facts on the issue of whether or not they provide independent corroboration of the defendant's representation that James Salter agreed to pay him money and things of value to arrange for the death of Julie Ann Salter.

(4) If the State concludes that said information, in conjunction with information otherwise known to the state, does provide said independent corroboration, then and in that event the state will allow the defendant to enter a plea of guilty to the charge of murder with the understanding that the defendant will receive a life sentence with an order that he serve a minimum of ten years before being eligible for parole, and that said sentence will run concurrent to any sentence the defendant is now serving.

.  .  .  .  .

(6) It is further agreed by the defendant that if such plea should be entered, that the state will seek a presentence investigation and the defendant will testify truthfully in any trial against any other person who may be indicted in the future for any crime connected with the death of Julie Ann Salter.

.  .  .  .  .

(8) Should the defendant refuse to cooperate or give information requested pursuant to this agreement, or should the state conclude under the terms of this agreement that the information does not provide independent corroboration, the parties agree that no evidence resulting from this agreement, whether that evidence is information, persons, names, documents or physical exhibits, will be introduced by the state against the defendant in any trial or hearing unless the state can establish that it was already aware of that information.

.  .  .  .  .

King provided information to police and testified at the grand jury and bail hearings of James Salter. Then King demanded something more from the state, in addition to the ten year eligibility for parole and delay of his trial for which he had bargained. He insisted that the State of Oregon agree to facilitate his transfer to a prison in his home state of Alabama, and threatened to stop taking his medication so that he would relapse into his preexisting mental illness if the state did not acquiesce. Exh. 119, at 516–R–T. The state refused to grant King's additional requests and he stopped taking his medication. *Id.*

On February 24, 1984, King sent a handwritten motion to the court to obtain a trial date and dismiss counsel. In the motion he stated that he "withdraws in full . . . from all life endangering plea-negotiations that exist at present."[1] Appellant's brief,

---

1. King apparently considered his agreement "life endangering" because he allegedly had been re-

at A–4. In response, the trial court held a hearing, during which King's counsel questioned King's competence to decide whether to proceed pro se. The court ordered an examination by Dr. Parvaresh, who opined that King was not competent at that time, but if he began taking his medication, his competence should be reevaluated in seven to ten days. The court ordered additional examinations.

In April 1984, King testified at the trial of James Salter, as agreed under the terms of the plea agreement. On May 31, 1984, the trial court held a hearing to determine whether King was competent to assist his own defense. Evidence was presented by both sides regarding King's psychological fitness, and the trial court found that King "understands the nature of the proceedings and that he is able to assist and co-operate with counsel and is able to participate in his defense." Exh. 119, at 518–19. There was testimony that King had studied psychology and completed law school, and that he would feign mental illness to manipulate the proceedings in his case. King's counsel advised the court that King had gone back on his medication and was able to understand the proceedings and assist counsel, so he did not wish to call witnesses and requested that the court make its ruling based upon the medical reports. King would not speak in court so that the court could make an independent judgment, so the state, concerned about the adequacy of the record, called medical witnesses anyway, and King's attorney cross-examined. The court ruled that King was competent to stand trial, and that ruling is not challenged in this appeal.

Then the court asked counsel if a trial date should be set. King, through counsel, advised the court that a trial date should be set, and that King was withdrawing his motion to proceed pro se:

> MR. LYONS [King's counsel]: Your Honor, I have discussed this with Mr. King. Again he does not wish, for whatever reason may be, to make any representations to the Court. But he has authorized me to

do so. And *we are prepared to set a trial date in this case.*

> I would point out to the Court that Mr. King tacitly is withdrawing his motion to proceed pro se, which puts me back in the position of being his attorney at this time.

> .    .    .    .    .

> . . . I could be prepared for trial by the middle of August. . . .

> THE COURT: What is your reaction?

> MR. MILLER [Deputy District Attorney]: I'm going to let Mr. Eglitis address the trial, scheduling the trial. My reaction, I would like to mention to the Court, is that the defendant has entered a plea of not guilty to this charge of Aggravated Murder. Under our agreement that we have entered into with the defendant, we have offered him an opportunity, pursuant to our agreement, to plead guilty to the charge of Murder with certain understandings. *It's my understanding that by asking for a trial date at this time he is seeking to withdraw that plea agreement.* And if that is the case, we want that understood right now.

> THE COURT: Well, I would think, Mr. Miller, you better file a formal motion to that effect . . . because the plea agreement that I approved is in the file, is it not?

> MR. MILLER: Yes.

> THE COURT: And I think some disposition has to be made of that. *So if I were you, I would file a formal motion to not be bound by the plea agreement, that it be held for naught, no force and effect.*

> MR. MILLER: All right.

> THE COURT: The record then would stand that he has a not guilty plea to the charge of Aggravated Murder.

*Id.* at 519–21 (emphasis added).

King's attorney did not contradict the government's "understanding that by asking for a trial date at this time he is seeking to withdraw that plea agreement." He proceeded instead to request co-counsel for the trial.

---

ceiving death threats from other prisoners for agreeing to testify against Salter. These alleged

threats contributed to his desire for a transfer to Alabama.

The state then filed a motion for the court to enter a finding that King rescinded the plea agreement. A hearing was held on July 9, 1984. One of King's attorneys explained that "we are still trying to work out the custody arrangement to the State of Alabama. I feel that may have some bearing on what Mr. King decides to do here." He requested more time to work on getting "a commitment out of, at least, the Alabama Parole Board," so that after Alabama committed itself, King could "make an intelligent decision as to whether he wants to pursue the plea agreement or go to trial." The state's attorney responded by explaining its need to know whether King was going to plead guilty or not, because expensive trial preparation needed to begin if he would not. The State was at that time still willing to abide by the terms of the plea agreement:

> ... today is the 9th of July. The State would like to know for certain, we would like to start preparing for trial. And even the preparations for trial are exceedingly expensive. As the court may know, this case involves largely out-of-state witnesses. It's a lengthy and expensive procedure to procure their attendance and we would like not to have to wait until any longer to begin that. We, of course, would like not to begin it if, in fact, we know that Mr. King is going to enter his plea of guilty and follow the plea agreement.

The judge, noticing the offer to proceed according to the plea agreement, asked for clarification from the state of its position, obtained it, and entered a finding that the state was no longer bound by the plea agreement:

> THE COURT: Do you think you are still bound by the plea agreement and will go through with it after what has happened?
> MR. EGLITIS [Deputy District Attorney]: Well, we are not, Your Honor. But I believe the option of that would then be with us. *Mr. King has indicated to this Court that he wants a trial date, that he doesn't want to have anything to do with the plea agreement and would like the Court to enter the order to that effect.* That would in essence leave the option with the State rather than with Mr. King.

> THE COURT: Do you want to add something else, Mr. Lyons?
> MR. LYONS: *No, Your Honor, I have nothing further to add at this time.*

*Id.* at 526 (emphasis added). The court then issued an order "relieving the State from any obligation that was originally involved in the plea agreement." *Id.* at 526–27. King's trial was scheduled to begin on August 20, 1984.

A month later, twelve days before trial, King filed a motion to compel specific performance of the plea agreement. He argued that he had substantially complied with his obligations under the agreement, so the state should accept a plea to the lesser charge of murder, rather than aggravated murder as charged, and he should receive the sentence originally agreed upon. At a hearing on the motion, King's attorney acknowledged that King had, after testifying against Salter, advised the court that he wanted to go to trial rather than proceed with the plea agreement, but claimed that at the time, King had not been taking his medication. The state's attorney pointed out that trial had now been delayed a year, four witnesses had disappeared, and the witnesses who would testify would have another year added to the time for memory to fade, and also pointed out King's apparent competence since the time the court had made the competency determination.

The trial judge denied King's motion, stating "I think it's mainly whether or not the State has been prejudiced by the failure of the defendant to follow the plea agreement, and I find they have been." *Id.* at 537. He noted the delay, the need to try to locate the witnesses again, and that this was the second or third time the state had to prepare the case for trial. The judge specifically found that King made an informed decision and knew what he was doing when he withdrew from the plea agreement. *Id.* at 538–39.

King was convicted at a jury trial of aggravated murder, and sentenced to life imprisonment, with a thirty year mandatory minimum.

King appealed, and exhausted his remedies in state court. *See State v. King*, 84 Or.App. 165, 733 P.2d 472, *rev. denied*, 303 Or. 455,

737 P.2d 1248 (1987). He then filed for habeas relief in federal court pursuant to 28 U.S.C. § 2254. He alleged, inter alia, that the state court prosecution should have been barred by the Interstate Agreement on Detainers and that the State of Oregon violated his right to due process by failing to perform its obligations under the plea agreement. These two issues are the subject of this appeal.

## II. The Plea Agreement.

■ We review de novo the district court's denial of habeas relief. *Adams v. Peterson,* 968 F.2d 835, 843 (9th Cir.1992) (en banc), *cert. denied,* — U.S. ——, 113 S.Ct. 1818, 123 L.Ed.2d 448 (1993). We review the district court's factual findings for clear error, and state court findings of fact are entitled to a presumption of correctness.[2] *Brown v. Burns,* 996 F.2d 219, 220 (9th Cir.1993); 28 U.S.C. § 2254(d) (presumption of correctness). To overcome the presumption of correctness, "the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous." 28 U.S.C. § 2254(d).

■ The state court specifically held that King was competent when he rescinded the plea agreement. *See King,* 733 P.2d at 479. "A finding on the issue of competence is a finding of fact," and thus is presumed correct. *Brewer v. Lewis,* 989 F.2d 1021, 1030 (9th Cir.1993). King has not presented evidence that he was incompetent at the time of the court's ruling sufficient to establish by convincing evidence that the state court's determination was erroneous. At the hearing to determine competency, both sides presented substantial evidence to support their positions. The state court's conclusion that King was competent is supported by the record, and is thus entitled to deference.

■ The state court also found that King rescinded the plea agreement by requesting a trial date and by failing to comply with the plea agreement. The Court of Appeals of Oregon stated that this "finding is supported by the evidence in the record and we are bound by it." *King,* 733 P.2d at 479.

The agreement required three acts by King, and one by the State of Oregon. King would (1) provide information, (2) testify, and (3) plead guilty to murder. The state would accept the plea to murder, rather than aggravated murder, and agree to a ten year mandatory minimum before eligibility for parole and a sentence concurrent with King's Washington sentence. This was a bilateral contract, in which the state promised to do one thing, if King did three. King did two, then announced his intention not to proceed further. The state changed its position in reliance on King's announced intention to go to trial. King had repeated opportunities to correct the state's misunderstanding, if it was a misunderstanding, that he would go to trial, not plead guilty. There was no misunderstanding, though, and King claims none. He just wanted something more than he had bargained for, incarceration in his home state of Alabama, instead of in Oregon.

In *United States v. Osif,* 789 F.2d 1404 (9th Cir.1986), we explained "a defendant does not have a constitutional right to a plea bargain, . . . nor, when he rejects a plea, can he later object to the government's decision to proceed to trial on the counts originally charged." *Id.* at 1405. Here, King rescinded the plea agreement, and thus it was no longer in force or available for him to accept. "The government is under no obligation to reoffer an agreement that was previously rejected. . . ." *Id.* Although King did not initially reject the government's offer of the plea agreement, he withdrew his acceptance. Thus, the government had no obligation to reoffer the original plea agreement.

"The construction of a plea agreement in a state prosecution and the concomitant obligations flowing from it are, within broad bounds of reasonableness, matters of state law." *Ricketts v. Adamson,* 483 U.S. 1, 6 n. 3, 107 S.Ct. 2680, 2684 n. 3, 97 L.Ed.2d 1 (1987). "Once a state court has, within broad bounds of reasonableness, determined that a

---

**2.** There are exceptions to the presumption of correctness, 28 U.S.C. § 2254(d)(1)–(8), but none apply here, where King was given full and fair hearings on the issues of his competence and the rescission of the plea agreement.

breach of a plea agreement results in certain consequences, a federal habeas court must independently assess the effect of those consequences on federal constitutional rights. This independent assessment, however, proceeds without second-guessing the effect of the breach and is not a license to substitute a federal interpretation of the terms of the plea agreement for a reasonable state interpretation." *Id.*

The state court decided that King had rescinded his agreement, and that the state had been prejudiced by his failure to abide by the agreement, so he was not entitled to specific performance. *King,* 733 P.2d at 479. The factual findings of intentional rescission, competence, and prejudice to the state, are entitled to the presumption of correctness. The determination falls well within the "broad bounds of reasonableness." King has not suggested that any constitutional right was violated by this determination. His argument appears to be that the state court determination fell outside the "broad bounds of reasonableness," because King had performed so much of his agreement that it violated his right to due process of law not to command specific performance against the state.

We reject the proposition that the Oregon state determination fell outside the "broad bounds of reasonableness." King partially performed his agreement, by giving information and testifying, but then repudiated it. *See* Restatement (Second) Contracts § 250 (1981). He said he would not plead guilty unless he got more than he had bargained for—he wanted Alabama incarceration, in addition to ten year parole eligibility and concurrent sentences. His repudiation was not a casual remark taken advantage of by a prosecutor eager to escape performance—he was brought into court, with counsel, and the matter was carefully reviewed in a context which gave King an opportunity to clarify his intention to adhere to the plea bargain, had that been his intention. King's repudiation of his agreement excused the government's failure to perform its part of the bargain. *Id.* § 253(2). A few days before trial, King offered to perform the agreement he had repudiated, that is, to nullify his repudiation.

*Id.* § 256. But the judge reasonably ruled that he did not have the power to impose on the government the contract he had repudiated. The July 9, 1984 hearing in open court established that the repudiation was understood by both parties as final, so King had no power subsequently to nullify it and take advantage of the repudiated agreement. *Id.* § 256(2). Also, the trial judge found that the government had materially changed its position in reliance on the repudiation, by engaging in expensive and burdensome pretrial preparation. *Id.*

Since the state court construction fell within "the broad bounds of reasonableness," we cannot engage in "second guessing the finding of breach" or substitute an independent federal interpretation which would treat King as having not breached, or as entitled to specific performance despite his breach. *Ricketts,* 483 U.S. at 6 n. 3, 107 S.Ct. at 2684 n. 3. The matter is not so hypertechnical as this explanation may sound. King and his attorney sat silently as the state in open court attempted to clarify the status of his intentions. The state trial judge reasonably prevented him from sandbagging the state with yet another change of position on the eve of yet another trial trial date. King made his decision, to repudiate his agreement, and was reasonably and fairly held to it.

## III. Interstate Agreement on Detainers.

■ King claims that his prosecution by the State of Oregon was barred by the Interstate Agreement on Detainers, codified at O.R.S. § 135.775 et seq. We have jurisdiction because of the Congressional approval of the compact, *see* 18 U.S.C. app. § 2 (1982), and review de novo. *Snyder v. Sumner,* 960 F.2d 1448, 1452 (9th Cir.1992) (citations omitted).

The State of Oregon indicted King on March 5, 1982, while he was in the custody of the State of Washington. Pursuant to the Interstate Agreement on Detainers, Oregon obtained custody of King on November 20, 1982. With a twenty-nine day extension agreed to by King, in addition to the 120 days provided for under O.R.S. 135.775, art. IV(c), Oregon had until April 18, 1983 to try

King. On April 11, 1983, King filed a motion to quash the March 5 indictment on the ground that it was returned by a grand jury consisting of only six members, rather than seven, as required under the Oregon Constitution.[3] The trial court granted King's motion and quashed the indictment.

On April 12, 1983, the prosecution filed a motion for a thirty day continuance to allow time to resubmit the case to a grand jury. The trial court found that "good cause" existed for the continuance, so it granted the state's motion. King challenges this ruling.

■ In his petition for writ of habeas corpus, King asserted that his "prosecution was barred under the speedy trial provisions of the Interstate Agreement on Detainers" on the ground that "the State's motion to postpone trial for an additional 30 days was granted improperly." CR 1, at 6. His argument conceded that good cause would excuse the delay, but claimed that there was no good cause:

> If the court was correct in concluding that the state showed good cause when it requested a 30 day continuance to obtain a new indictment, then the 120 day period would have been tolled for 30 more days and petitioner's position that the 120 day speedy trial requirement of the IAD had been violated would be incorrect.

.     .     .     .     .

> The question presented to this Court is whether a state, which obtains a defendant from another state through the use of an invalid indictment, can establish good cause for a continuance under the IAD when the defendant successfully moves to dismiss the invalid indictment and the basis for the state's continuance is the convening of a grand jury to obtain a new, valid indictment against the defendant.

CR 41, at 40–41.

The district court adopted the findings and recommendations of the magistrate judge, that there was good cause:

In light of the timely nature of the State's request, and considering the nature of the request, I agree with the Oregon Court of Appeals' holding in this case that the trial court did not err in granting a continuance for good cause shown. In light of the previous indictment returned by the grand jury, a continuance to resubmit the charges to the grand jury was both reasonable and necessary.

ER 10.[4]

In rejecting this argument by King, the Oregon Court of Appeals reasoned as follows:

> Defendant argues that there is a contradiction in the trial court's rulings because, in dismissing the first indictment, the court found that there was not good cause for excusing one grand juror but, when the state requested a continuance, the court found good cause to continue. We see no contradiction. Although the prosecutor lacked good cause to excuse the juror, it does not follow that, when defendant's motion to quash was made just six days before his speedy trial period would expire, the state lacked good cause to seek a continuance to resubmit the case to the grand jury. The trial court did not err in denying defendant's motion.

*King,* 84 Or.App. at 170, 733 P.2d at 476. The Court of Appeals of Oregon has it exactly right. The unanimous indictment was technically defective, but King did not move to dismiss it until the end of the time period, so the state had good cause for a thirty day continuance to take the case to a grand jury for another indictment.

AFFIRMED.

PREGERSON, Circuit Judge, dissenting:

Because the State of Oregon failed to honor its obligations to King under the terms of

---

**3.** Initially, the grand jury consisted of seven members, but the prosecutor excused one of the jurors.

**4.** The magistrate judge correctly noted that the only issue King raised was "whether a trial court has the discretion to grant a continuance, upon a timely motion by the State, to permit the State to resubmit the case to the grand jury under the circumstances presented here." ER 11. To the extent that King raises additional issues relating to the Interstate Agreement on Detainers, we will not address them for the first time on appeal. *See United States v. Flores–Payon,* 942 F.2d 556, 558 (9th Cir.1991).

a plea agreement, I dissent from the majority opinion. I believe that the district court erred in finding that King's due process rights were not violated.

## BACKGROUND

On April 19, 1983, King was indicted for the aggravated murder and murder of Julie Salter in Clackamas County, Oregon. On August 3, 1983, King and the State of Oregon ("the state") entered into a plea agreement, which was accepted by the court. Under the terms of the agreement:

1. King agreed to provide information to the state concerning the involvement of co-defendant James Salter in the murder of Salter's ex-wife, Julie. King also agreed to testify for the state at any bail hearings, grand jury proceedings, and trials in the James Salter prosecution.

2. In exchange for King's cooperation, the state agreed to "allow [King] to enter a plea of guilty to the charge of murder with the understanding that [King would] receive a life sentence with an order that he serve a minimum of ten years before being eligible for parole, and that said sentence will run concurrent to any sentence the defendant is now serving." [1]

The plea agreement did not set a deadline for King to enter a guilty plea. The agreement further provided that if King refused to cooperate, "no evidence resulting from th[e] agreement, whether that evidence is information, persons, names, documents or physical exhibits, [would] be introduced by the state against [King] in any trial or hearing unless the state can establish that it was already aware of that information."

On December 6, 1983, King testified at Salter's grand jury proceedings in accordance with the plea agreement. On December 7, 1983, King's counsel told the court that King wished to enter his guilty plea in the middle of the following week. On December 14, 1983, the state and King agreed to continue the entry of his plea to a future date, as long as King entered such plea *before* the Salter trial.[2]

King continued to fulfill his obligations under the plea agreement. In addition to testifying before the grand jury, King spoke with the Oregon police about Salter's involvement in Julie Salter's murder and testified at Salter's bail hearing in January 1984.

In December 1983, King began receiving serious death threats from other prisoners because of his agreement to testify against Salter. As a result, Oregon State prison authorities implemented extraordinary security provisions to ensure King's safety.[3] In addition, King's counsel undertook efforts to arrange for King's transfer to state prison in Alabama, King's home state.

On February 23, 1984, King filed a handwritten motion asking the court to discharge his attorneys so he could proceed pro se. In addition, he asked the court to set a trial date and accused his attorneys of placing his life in jeopardy because of their plea negotiations. Accordingly, he asked the court to

---

1. King was already serving two consecutive sentences, each with a twenty year minimum, in Washington state prison.

2. On this issue, the following exchange occurred:
   THE COURT: What is the purpose of delaying the entry of that plea?
   THE DISTRICT ATTORNEY: Your Honor, this we have been informed Mr. King wishes. We examined the relative benefits and detriments that might result in a trial of Mr. Salter and it's our opinion it is of no detriment to us as long as the plea is entered before Mr. King testifies, or probably more specifically before the Salter trial starts.
   THE COURT: What if he changes his mind?
   THE DISTRICT ATTORNEY: Prior to the testimony?
   THE COURT: Yes.

   THE DISTRICT ATTORNEY: In that sense, Your Honor, there would be a breach of the agreement and we would proceed as if the agreement was null and void. In other words, we would go ahead and prosecute Mr. King for the charge of aggravated murder.

3. Affidavits from prison officials indicated that King's cell was fitted with bullet-proof plates of armor and King was put in a bullet-proof vest and disguised whenever he was taken from his cell. Indeed, the prison authorities stated that the security precautions for King were the most extreme they had ever seen. In fact, despite such precautions, a fellow prisoner still managed to stab King in the eye with a pencil after calling him a "snitch."

permit him to withdraw from "all life endangering plea agreements."

On February 24, King asked the court to permit him to proceed pro se. King stated to the court that he no longer wished to enter a guilty plea as allowed under the plea agreement because the state refused to guarantee him a transfer to Alabama as requested by him for security reasons.

As a result of King's motions, one of King's two attorneys told the court that King was not competent to represent himself and moved to withdraw. On February 27, 1984, King's second attorney advised the court that King was not competent to stand trial because he was mentally ill and had stopped taking his medication, which included daily doses of Tegretol, Dilantin, Haldol, Lithium, and Benadryl.[4] In response, the court ordered Dr. Parvaresh, a psychiatrist, to conduct an examination to determine King's competency to stand trial.

On March 3, 1984, the state also moved for a competency examination of King and requested that the examination be conducted at the Oregon State Hospital. On March 9, 1984, Dr. Parvaresh submitted his written opinion, which concluded that King "is not competent to stand trial as he is clearly mentally too impaired to assist in his own defense." On April 9, 1984, Dr. Jerry K. Larsen, a second psychiatrist, gave a similar opinion. The court held no hearing concerning King's mental competency until the end of May 1984.

In April 1984, Salter's murder trial began. At the trial, King fulfilled another part of his plea agreement obligations by testifying against Salter for three days. Despite the state's previous assertion at the December 14, 1983 hearing that it wanted King to enter his guilty plea *before* testifying at the Salter trial, the state did *not* require King to enter a guilty plea before testifying. On May 10, 1984, Salter was acquitted.

On May 17, 1984, King's counsel reminded the court that it had not yet ruled on King's competency to stand trial and to proceed pro

se. The court had postponed the competency hearing to allow King to testify at the Salter trial.

On May 31, 1984, the court held a competency hearing. The court determined that, although King suffers from a "mental defect," he was nonetheless able to assist in his own defense. Hence, the court determined that King was competent to stand trial. King refused to address the court but through his counsel withdrew his motion to proceed pro se.

In addition, at the May 31 hearing, King's counsel told the court that King had asked that a trial date be set. In response, the prosecutor took the position that, by requesting a trial date, the state assumed that King was seeking to withdraw from the plea agreement. The court told the state to file a formal motion for rescission. On June 5, 1984, the state filed a motion asking the court to find that King had rescinded the plea agreement.

On July 9, 1984, King's counsel asked the court for additional time before ruling on the state's request to terminate the plea agreement. In the interim, King's counsel wished to see if he could secure a commitment from Alabama for King's transfer to Alabama state custody. King's counsel informed the court that he had prepared a 700–page presentation for the Alabama Parole Board, and was still trying to arrange the the transfer. King's counsel further informed the court that a commitment from Alabama would permit King to "make an intelligent decision as to whether he wants to pursue the plea agreement or go to trial."

In response, the prosecutor argued that the state did not want to undertake extensive trial preparations if King were ultimately going to plead guilty. The prosecutor again asserted that, by asking for a trial date, King had withdrawn from the plea agreement. King's counsel remained silent. The trial court then issued an order terminating the plea agreement. In so ruling, the court simply stated "[t]hat the defendant has breached

---

4. King has suffered from mental illness since he sustained head injuries in an aircraft accident in January 1979. As a result, he experienced memory loss and has since required hospitalization and medication to control grand mal seizures.

and rescinded the plea agreement entered into between the defendant and the State of Oregon." *State v. King,* 84 Or.App. 165, 175, 733 P.2d 472, *rev. denied,* 303 Or. 455, 737 P.2d 1248 (1987) (citing trial court transcript).

On August 8, 1984, twelve days before his trial was scheduled to begin, King filed a motion expressing his desire to plead guilty and asking the court to compel specific performance of the plea agreement. The state opposed King's motion, alleging that it had been prejudiced because of the cost and inconvenience of having to prepare for trial.

On August 15, 1984, the court held a hearing on King's motion to compel specific performance of the plea agreement. At the hearing, King's counsel pointed out that King had fully complied with his duties under the plea agreement by cooperating with the state in Salter's prosecution and by testifying against Salter for three days. In addition, King's counsel reminded the court that, in reliance on the plea agreement, King had relinquished substantial rights, such as the right to a speedy trial, the right to remain silent, and the right not to incriminate himself. Accordingly, counsel argued that fundamental fairness as required by the Fourteenth Amendment's Due Process Clause mandated that King receive the benefit of his plea bargain. King's counsel also told the court that he did not believe King was competent to make an informed and rational decision about entering a plea when he earlier asked for a trial date.

The trial court found that King's request for a trial date had prejudiced the state. Hence, the court denied the motion to compel specific performance of the plea agreement.

Thereafter, King was tried and convicted by a jury for aggravated murder in violation of O.R.S. 163.095(1). The trial court sentenced him to life imprisonment, with thirty years' mandatory minimum. The court further ordered this sentence to be served consecutively to the two consecutive, twenty-

year minimum sentences he was already serving in the State of Washington.

After exhausting state remedies, *see State v. King,* 84 Or.App. 165, 733 P.2d 472, *rev. denied,* 303 Or. 455, 737 P.2d 1248 (1987), King filed a habeas corpus petition in federal district court under 28 U.S.C. § 2254. In his petition, King alleged that the failure of state authorities to fulfill their obligations under the plea agreement violated his right to fundamental fairness as guaranteed by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. In addition, King asked the district court to decide: (1) whether the state had waived its objections to King's failure to enter a guilty plea by using his testimony at trial without insisting he enter a plea; (2) whether King was competent to enter or withdraw from a plea; (3) whether King was ever required to enter a plea before the start of his trial under the terms of the plea agreement, which was drafted by the state and did not contain a cut-off date for entry of plea; and (4) whether the state had demonstrated prejudice.

The district court did not address any of King's substantive arguments.[5] Rather, on April 23, 1992, the court dismissed King's habeas petition on the ground that it lacked jurisdiction because King had not demonstrated a violation of a federal constitutional right. In so ruling, the court concluded that King had not relied to his detriment on the state's promises in the plea agreement because *in King's own trial* the state did not use anything said or done by King under the plea agreement to secure his conviction.[6]

### ANALYSIS

King alleges a violation of his right to fundamental fairness as guaranteed by the Fourteenth Amendment's Due Process Clause and therefore raises a cognizable claim for habeas corpus relief under 28 U.S.C. § 2254.

Specifically, King contends that it was fundamentally unfair for the state to reap the

---

5. King's habeas petition was referred to a Magistrate who made recommended findings of fact and conclusions of law, which the district court then adopted in their entirety.

6. "Detrimental reliance" is a phantom issue. The dispositive issue is "fundamental fairness" as required by the Due Process Clause.

benefit of his substantial cooperation under the plea agreement and then turn around and rescind the agreement, which he had not breached. As support for such claim, King cites the following: (1) he disclosed relevant information to the police about Salter's involvement in Julie Salter's murder; (2) he testified for the state at Salter's bail and grand jury hearings; and (3) he testified for three days for the state at Salter's murder trial. Hence, King contends that he is entitled to specific performance of the plea agreement.

"Applying the Due Process Clause is ... an uncertain enterprise which [requires that we] discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." *Lassiter v. Department of Soc. Serv. of Durham Cty.*, 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158–59, 68 L.Ed.2d 640 (1981). As a general rule, the fundamental fairness component of the Due Process Clause of the Fourteenth Amendment requires prosecutors to honor bargains made with criminal defendants. *See, e.g., Mabry v. Johnson*, 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984); *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *United States v. Carrillo*, 709 F.2d 35, 37 (9th Cir. 1983). Because plea agreements implicate important due process rights, "the process must be fair." *United States v. Packwood*, 848 F.2d 1009, 1011 (9th Cir.1988).

This circuit has concluded that where a defendant has fulfilled *all obligations* under a plea agreement, "under settled notions of fundamental fairness the government [is] bound to uphold its end of the bargain." *Carrillo*, 709 F.2d at 37 (emphasis added) (citing *United States v. Irwin*, 612 F.2d 1182, 1189–91 (9th Cir.1980) (recognition of enforceability of cooperation agreements); *United States v. Garcia*, 519 F.2d 1343, 1345 & n. 2 (same); *United States v. Hallam*, 472 F.2d 168, 169 (9th Cir.1973) (where defendants fully discharge their obligations under plea agreement government is bound to fulfill its promise to forego future criminal prosecution)) (additional citations omitted).

Here, under the plea agreement, King agreed to provide information to the state regarding the involvement of co-defendant Salter in the murder of Julie Salter. King also agreed to testify for the state at bail hearings, grand jury proceedings, and the trial in the Salter prosecution.

In return, the state agreed *to allow* King to plead guilty to murder instead of aggravated murder and thereby receive a more favorable sentence.

The state now contends that under the plea agreement King was *obligated* to enter his guilty plea, and to do so by a certain date. Hence, the majority opinion concludes that, by asking the court to set a trial date, King breached the plea agreement by failing to perform an obligation thereunder. I disagree.

In interpreting a plea agreement, we hold the state to the *literal* terms of the plea agreement. *Packwood*, 848 F.2d at 1012; *United States v. Read*, 778 F.2d 1437, 1441 (9th Cir.1985), *cert. denied*, 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986). Here, the literal language of the plea agreement provides that the state *will allow, not require*, King to enter a guilty plea as a result of his cooperation in Salter's prosecution. In addition, the language of the plea agreement does not state that King will relinquish his right to enter a guilty plea if he fails to enter such plea by a particular deadline.

Hence, I submit that one may properly assume from the literal language of the plea agreement that King was *allowed* to enter a guilty plea to murder at any time before the start of his own trial. Indeed, I note that the state did not hesitate to call King as a witness in Salter's trial in April 1984, *despite* the fact that King had not yet entered his guilty plea and had stated to the court in February 1984 that he wanted to withdraw from the "life endangering" plea agreement.

I therefore conclude that King affirmatively complied with *all* of his *obligations* under the plea agreement by providing all of the information and testimony required of him by the state.

Moreover, other factors convince me that King did not breach the plea agreement by

requesting a trial date. King's competency was seriously at issue during this period because, despite his mental illness, King had stopped taking his medication. As a result, the court ordered several psychiatric evaluations and held a hearing to determine King's competency.[7] Also, King requested withdrawal from "all life endangering plea agreements" only after he had received serious death threats that had prompted prison officials to implement extraordinary security provisions to ensure his safety. Such threats resulted directly from his agreement to turn state's witness against Salter. In fact, King's counsel, at the time the motion to rescind was heard, specifically requested additional time to secure a transfer to Alabama state prison to ensure King's safety, to enable King to "make an intelligent decision as to whether he wants to pursue the plea agreement or go to trial." The court summarily denied this request.

In light of King's full compliance with *all obligations* under the plea agreement and his precarious mental state, which no doubt was exacerbated by the threats against his life resulting from his cooperation with the state, it defies reason to construe King's request for a trial date as a rescission of the plea agreement. The Oregon courts erred in so doing.

In light of the foregoing, I find that fundamental fairness as guaranteed by the Fourteenth Amendment's Due Process Clause mandates the specific performance of the state's obligations under the plea agreement.[8] Accordingly, I believe that this case should be remanded to the district court to issue a writ of habeas corpus directing the State of Oregon within 60 days to vacate King's conviction on condition that King enter a guilty plea and receive a sentence in accordance with the plea agreement, or, in the alternative, to release King from the strictures of his Oregon sentence.

---

7. King's apparent instability is evidenced by the fact that, despite his alleged desire to withdraw from the "life endangering" plea agreement, he still testified against Salter *for three days* at Salter's murder trial in accordance with the terms of such plea agreement. The state cannot urge this court to accept King's alleged intentions to withdraw from the plea agreement as credible when the state itself did not do so, but proceeded to call King as a witness in the Salter murder trial under the terms of the plea agreement.

8. In light of this dispositive ruling, I see no need to address any other issues raised by the briefs or the district court's dismissal of King's habeas petition.