STATE of Wisconsin EX REL. Frederick Lee PHARM,
Petitioner-Appellant-Petitioner,

v.

Byran BARTOW, Director and Wisconsin Resource
Center, Respondents-Respondents.

Supreme Court

*No. 2004AP583. Oral argument September 7, 2006.
—Decided January 25, 2007.*

2007 WI 13

(Also reported in 727 N.W.2d 1.)

703

For the petitioner-appellant-petitioner there were briefs by *Jon G. Furlow, Roisin H. Bell, Nia Enemuoh-Trammell,* and *Michael Best & Friedrich LLP,* Madison, and oral argument by *Jon G. Furlow.*

For the respondents-respondents the cause was argued by *Warren D. Weinstein,* assistant attorney general, with whom on the brief was *Peggy Lautenschlager,* attorney general.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This is a review of a decision of the court of appeals that affirmed the circuit court's order[1] denying Frederick

---

[1] The Honorable Bruce Schmidt, Circuit Court Judge for Winnebago County, presided.

---

Lee Pharm's (Pharm) petition for habeas corpus discharge from his commitment pursuant to Wis. Stat. ch. 980 (2003–04).[2] Pharm asserts that due to the Interstate Agreement on Detainers (IAD) and his waivers of extradition for criminal proceedings, Wisconsin was precluded from commencing commitment under ch. 980 following the term of incarceration imposed for crimes committed in Wisconsin.

¶ 2. We conclude that neither the IAD nor Pharm's waivers of extradition under the IAD for his prosecution and incarceration by Wisconsin precluded Wisconsin from commencing a ch. 980 commitment proceeding. Pharm's rights under the IAD and its extradition waivers were fully accorded upon his return to Wisconsin to serve his outstanding criminal sentence. At that point, the IAD had no further application to Pharm. In addition, any obligations Wisconsin had to Nevada under the IAD were concluded when Pharm was returned to Nevada to complete his term of incarceration for his Nevada convictions. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶ 3. The relevant facts are undisputed. In 1975, Pharm committed sexual acts that led to criminal charges in Milwaukee County. Pharm left Wisconsin prior to his arrest on those charges. In 1977, Pharm was convicted of murder in Nevada and sentenced to life in prison. In October 1987, the Nevada Department of

---

[2] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

Prisons informed Pharm that Wisconsin had filed a detainer against him based on pending charges in Milwaukee County.

¶ 4. In response, Pharm executed a "Request for Disposition of Indictments, Informations or Complaints," pursuant to IAD Article III, Wis. Stat. § 976.05(3). Pharm's Request for Disposition asked for "final disposition of all untried indictments, informations or complaints on the basis of which detainers have been lodged." As part of his Article III request, he agreed that in asking for prompt final disposition,

> I also agree that this request shall be deemed to be my waiver of extradition with respect to any charge or proceeding contemplated hereby or included herein, and a waiver of extradition to your state to serve any sentence there imposed upon me, after completion of my term of imprisonment in this state.

Pharm further consented to be produced in any court necessary to effectuate the purposes of the IAD and to be voluntarily returned to Nevada to complete his term of incarceration there.

¶ 5. Based on Pharm's Request for Disposition, Nevada submitted an "Offer to Deliver Temporary Custody" to Wisconsin, "in order that speedy and efficient prosecution may be had of the indictment, information or complaint . . . ." Wisconsin then sent a document entitled "Prosecutor's Acceptance of Temporary Custody Offered in Connection with an Inmate's Request for Disposition of a Detainer." It was signed by the Milwaukee County Assistant District Attorney and stated, "I propose to bring this person to trial on the complaint named in the offer within the time specified in Article III(a) of the Agreement on Detainers." Wisconsin also agreed to return Pharm to Nevada, or any

jurisdiction Nevada designated to take temporary custody, immediately after a trial on the Wisconsin charges was completed. Thereafter, Pharm was transported to Wisconsin to face criminal charges.

¶ 6. A jury found Pharm guilty of both indecent behavior with a child and sexual perversion. The circuit court imposed consecutive indeterminate sentences, not to exceed a total of fifteen years, and ordered the sentences to be served consecutively to Pharm's life sentence in Nevada. Pharm was then returned to Nevada to continue incarceration there.

¶ 7. In October 1990, Pharm was paroled by Nevada. The Parole Agreement stated as a condition, "Parole to Wisconsin Detainer." Nevada authorities sent a letter to Wisconsin authorities regarding the terms of Pharm's custody, which stated:

> The above named subject has been paroled to your "HOLD" and will remain under Nevada's parole supervision until Life.
>
> To assist us in fulfilling our responsibility in this matter we request that you notify us immediately should the subject escape from your custody, or of the final disposition of any pending charges.
>
> Please accept this letter as a request for sixty (60) days notification prior to the subject's release or transfer within your system.

¶ 8. In contrast to what occurred before Pharm's Wisconsin trial on outstanding charges, Nevada executed no Offer to Deliver Temporary Custody prior to Pharm's return to Wisconsin to begin his term of incarceration. Wisconsin then took custody of Pharm and brought him to Wisconsin for confinement in a Wisconsin prison.

¶ 9. Pharm's mandatory release date from a Wisconsin prison was scheduled for October 28, 1997. Prior to his release, Nevada wrote Pharm advising him to contact the Nevada Division of Parole and Probation upon his release.[3] However, on the date of his scheduled release, Wisconsin initiated a ch. 980 proceeding to commit Pharm as a sexually violent person. Following a jury trial, Pharm was found to be a sexually violent person, and the Milwaukee County Circuit Court committed him to a secure mental health facility. Pharm's commitment was upheld on direct appeal. *State v. Pharm*, 2000 WI App 167, 238 Wis. 2d 97, 617 N.W.2d 163.

¶ 10. Pharm moved, pursuant to Wis. Stat. § 806.07(1)(h), to vacate the judgment on the grounds that his commitment violated the Uniform Criminal Extradition Act (UCEA), Wis. Stat. § 976.03. The circuit court denied the motion and the court of appeals summarily affirmed. *State v. Pharm*, No. 2001AP2835, unpublished slip op. (Wis. Ct. App. April 8, 2003). Next, Pharm filed a federal habeas corpus petition claiming a

---

[3] It appears that Pharm intended to remain in Wisconsin after his release from confinement. The Nevada Division of Parole and Probation had requested in a letter dated August 26, 1997, that upon his release, Pharm was to immediately contact the Division of Parole and Probation when he arrived at his mother's residence. The letter does not indicate where his mother resided; however, the criminal complaint filed with the Milwaukee County Circuit Court states that at that time Pharm's mother lived in the city of Milwaukee.

There is no letter in the record indicating whether Wisconsin notified Nevada 60 days prior to the conclusion of Pharm's sentence, as Nevada requested. However, based on Nevada's correspondence to Pharm that is referred to above, it appears that Nevada was notified of Pharm's pending release.

violation of the IAD, which was dismissed by the district court for failure to exhaust state remedies.

¶ 11. Pharm then filed this habeas corpus action, alleging his ch. 980 commitment violated the IAD. The circuit court denied Pharm's habeas petition, which decision was affirmed by the court of appeals. *State ex rel. Pharm v. Bartow*, 2005 WI App 215, 287 Wis. 2d 663, 706 N.W.2d 693. In so concluding, the court of appeals held that Pharm had no right to be returned to Nevada or to expect immunization from potential commitment proceedings under ch. 980. *Id.*, ¶ 25. Pharm petitioned for review, which we granted.

## II. DISCUSSION

A. Standard of Review

¶ 12. The review of an order denying habeas corpus relief is a mixed question of fact and law. *State v. Pozo*, 2002 WI App 279, ¶ 6, 258 Wis. 2d 796, 654 N.W.2d 12. We will not reverse findings of fact unless they are clearly erroneous. *Id.* However, the circuit court made no factual findings in this case. Therefore, whether habeas corpus relief is available is a question of law that we review independently. *Id.* (citing *State ex rel. Woods v. Morgan*, 224 Wis. 2d 534, 537, 591 N.W.2d 922 (Ct. App. 1999)); *see also State ex rel. Hager v. Marten*, 226 Wis. 2d 687, 693–94, 594 N.W.2d 791 (1999) (citation omitted).

¶ 13. To review the order that denied habeas corpus relief in light of the arguments Pharm raises, we interpret the IAD, codified at Wis. Stat. § 976.05. The interpretation and application of a statute to an undis-

puted set of facts are questions of law that this court reviews independently. *State v. Sostre*, 198 Wis. 2d 409, 414, 542 N.W.2d 774 (1996) (citing *Ynocencio v. Fesko*, 114 Wis. 2d 391, 396, 338 N.W.2d 461 (1983)).

## B. The IAD

¶ 14. The IAD is an interstate compact that prescribes "procedures by which a member State may obtain for trial a prisoner incarcerated in another member jurisdiction and by which the prisoner may demand the speedy disposition of certain charges pending against him in another jurisdiction." *State v. Eesley*, 225 Wis. 2d 248, 254, 591 N.W.2d 846 (1999) (quoting *United States v. Mauro*, 436 U.S. 340, 343 (1978)). Both Wisconsin and Nevada are party states to the IAD. The IAD is set out in Wis. Stat. § 976.05 and Nev. Rev. Stat. § 178.620 (2005). The IAD aids in efficient prosecution of crimes and it removes uncertainties that obstruct programs of prisoner treatment and rehabilitation by clarifying prisoner status. § 976.05(1).

¶ 15. The IAD is a congressionally sanctioned interstate compact within the meaning of the Compact Clause of the United States Constitution, Art. I, § 10, cl. 3, "and thus is a federal law subject to federal construction." *Carchman v. Nash*, 473 U.S. 716, 719 (1985) (citing *Cuyler v. Adams*, 449 U.S. 433, 438–442 (1981)). Therefore, in order to accord more consistency with the IAD interpretations of other federal and state courts, we may employ federal rules of construction in interpreting Wis. Stat. § 976.05.

¶ 16. We begin by "determin[ing] whether the language at issue has a plain and unambiguous meaning . . . . Our inquiry [will] cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)). To determine whether statutory language is plain and unambiguous, we look to the "language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341 (citations omitted). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580–81 (1975)). If a statute is plain and unambiguous on its face, the legislative history is not ordinarily used as a guide to its meaning.[4] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 n.29 (1978) (citing *Ex parte Collett*, 337 U.S. 55, 61 (1949)).[5]

¶ 17. The provisions of the IAD are triggered when a detainer is filed or "lodged" for an untried criminal charge by any party state that seeks custody with a party state that has custody. *Mauro*, 436 U.S. at

---

[4] This approach to statutory construction is consistent with Wisconsin's principles of statutory construction. *See State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶¶ 45–48, 271 Wis. 2d 633, 681 N.W.2d 110.

[5] We do note that the legislative history, which is detailed by the United States Supreme Court in *United States v. Mauro*, 436 U.S. 340 (1978), is completely consistent with a statutory interpretation that utilizes a plain meaning approach.

343–44. There are two IAD provisions by which a receiving state may obtain transfer of temporary custody of a prisoner and cause him or her to appear for trial, Article III or Article IV.[6] *Cuyler*, 449 U.S. at 443–45; Wis. Stat. § 976.05(3)-(4).

¶ 18. Article III of the IAD, Wis. Stat. § 976.05(3), comes into play when the prisoner is notified that a detainer has been lodged and he or she initiates a request for final disposition of outstanding indictments, informations or complaints. *Cuyler*, 449 U.S. at 444; § 976.05(3)(a).[7] An IAD Article III Request for Disposition by a prisoner includes a waiver of extradition to stand trial and a waiver of extradition to serve any sentence that is imposed subsequent to conviction. § 976.05(3)(e).[8]

---

[6] A "receiving state" under the IAD is that state seeking custody, Wis. Stat. § 976.05(2)(a), and a "sending state" is the state that has custody when the detainer is lodged, § 976.05(2)(b).

[7] Wisconsin Stat. § 976.05(3)(a) provides in relevant part:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, the prisoner shall be brought to trial within 180 days after the prisoner has caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of . . . his or her request for a final disposition to be made of the indictment, information or complaint . . . .

[8] Wisconsin Stat. § 976.05(3)(e) provides in relevant part:

Any request for final disposition made by a prisoner under par. (a) shall also be deemed to be a waiver of extradition with respect to any charge or proceeding contemplated thereby or included therein by reason of par. (d), and a waiver of extradition

¶ 19. Article IV of the IAD, Wis. Stat. § 976.05(4), effects prisoner transfer when the prisoner is notified that a detainer has been filed, but he or she does not make an affirmative request under Article III. Instead, the prosecuting attorney of the receiving state that filed the detainer initiates transfer by filing a written notice of the custody request with the proper authorities in the sending state. *Cuyler*, 449 U.S. at 444; § 976.05(4)(a).[9] The prisoner effects no waiver of extradition in an Article IV proceeding so that a hearing on the prisoner's right to resist extradition may be held under the UCEA, in those states that have enacted the UCEA. *Cuyler*, 449 U.S. at 448; § 976.05(4)(d).[10]

to the receiving state to serve any sentence there imposed upon the prisoner after completion of the prisoner's term of imprisonment in the sending state. The request for final disposition shall also constitute a consent by the prisoner to the production of the prisoner's body in any court where the prisoner's presence may be required in order to effectuate the purposes of this agreement and a further consent voluntarily to be returned to the original place of imprisonment in accordance with the provisions of this agreement.

[9] Wisconsin Stat. § 976.05(4)(a) provides in relevant part:

The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom the officer has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with sub. (5)(a) upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated . . . .

[10] Wisconsin Stat. § 976.05(4)(d) provides:

Nothing contained in this subsection shall be construed to deprive any prisoner of any right which the prisoner may have to contest the legality of the prisoner's delivery under par. (a), but such delivery may not be opposed or denied on the grounds that the executive authority of the sending state has not affirmatively consented to or ordered such delivery.

717

¶ 20. Pharm made a Request for Disposition under Article III, Wis. Stat. § 976.05(3). An Article III Request for Disposition requires waivers of extradition to face pending charges and to serve any sentence subsequently imposed. § 976.05(3)(e). Therefore, under the IAD no hearing pursuant to the UCEA is available to him in regard to extradition for either his trial or service of any term of incarceration imposed by Wisconsin under the IAD detainer it filed. *Cuyler*, 449 U.S. at 445.

¶ 21. Pharm contends that Wisconsin had only temporary custody of him while he was in a Wisconsin prison. Therefore, he argues, when he was paroled by Wisconsin, Wisconsin was required by the IAD to return him to Nevada. Pharm misperceives the scope of temporary custody under the IAD.

¶ 22. In an Article III case, such as Pharm's, when final disposition of the charges has been requested by the prisoner, the sending state offers to deliver temporary custody of the prisoner "in order that speedy and efficient prosecution may be had." Wis. Stat. § 976.05(5)(a). The temporary custody referred to for this transfer is *"only for the purpose* of permitting prosecution on the charge or charges contained in one or more untried indictments, informations or complaints which form the basis of the detainer . . . ." § 976.05(5)(d) (emphasis added). Then, "[a]t the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending state." § 976.05(5)(e). "For all purposes other than that for which temporary custody as provided in this agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending state . . . ." § 976.05(5)(g).

¶ 23. Under the plain language of the statute, temporary custody does not include custody for the purpose of subsequent incarceration in a receiving state. *State of New York by Coughlin v. Poe*, 835 F. Supp. 585, 590–91 (E.D. Okla. 1993) (stating that temporary custody "does not expressly, or by implication, indicate custody for the purpose of service or execution of sentence in the receiving State"). This interpretation is supported by the record before us in regard to Nevada's actions prior to each time Pharm was taken to Wisconsin. For example, Nevada executed an "Offer to Deliver Temporary Custody" prior to Pharm's being transported to Wisconsin to face untried charges, but it executed no such document when it released Pharm to be transported to Wisconsin to begin to serve his term of incarceration. In addition, when Pharm was returned to Wisconsin to begin his term of incarceration, Wisconsin executed no document that evidenced an acceptance of temporary custody as it had when Pharm was sent to Wisconsin for trial.

¶ 24. Furthermore, the language of the IAD is clear and unambiguous. The IAD applies to detainers lodged against prisoners that are based on *untried* indictments, informations or complaints. As its purpose set out in Article I explains: "this agreement [is] to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." Wis. Stat. § 976.05(1). The reference to "untried" or "pending" charges is repeated in § 976.05(3)-(5). There is nothing in the IAD that indicates that the rights accorded to prisoners under it attach when there are no untried charges outstanding.

Therefore, we conclude that under the plain language of the statute, a prisoner has the following rights after he or she files a Request for Disposition under Article III (§ 976.05(3)): (1) transportation to a receiving state to answer pending charges; (2) commencement of a trial within 180 days in the receiving state; (3) return to the sending state to complete the prisoner's term of incarceration; and (4) upon completion of the prisoner's term of incarceration in the sending state, return to the receiving state to serve any term of incarceration that has been imposed there.

¶ 25. Pharm also argues that his Nevada parole is "imprisonment," as that term is used in the IAD. Imprisonment is not defined in the IAD. Therefore, it is defined according to its common meaning. *Perrin*, 444 U.S. at 42 (stating that unless otherwise defined, words will be interpreted as taking their common meaning) (citation omitted)). Federal courts have defined imprisonment as "that definable period of time during which a prisoner must be confined in order to complete or satisfy the *prison term or sentence* which has been ordered." *United States v. Dobson*, 585 F.2d 55, 58–59 (3rd Cir. 1978) (emphasis in original); *see also United States v. Reed*, 620 F.2d 709, 711 (9th Cir. 1980) (concluding a person on parole is not imprisoned under the IAD).

¶ 26. We note that under truth-in-sentencing in Wisconsin, "imprisonment" is defined as a bifurcated sentence comprised of initial confinement and extended supervision. *See* Wis. Stat. § 973.01; *State v. Cole*, 2003 WI 59, ¶ 27, 262 Wis. 2d 167, 663 N.W.2d 700. This definition is in contrast to the definition that was commonly used in Wisconsin prior to the enactment of § 973.01. At that time, Wisconsin defined imprisonment as "incarcerated or confined in a jail or prison." *Id.*,

¶ 26. However, state law does not drive the interpretation of the IAD, which is a federal compact subject to federal construction. *Carchman*, 473 U.S. at 719 (citing *Cuyler*, 449 U.S. at 438–442).

¶ 27. In addition, if the definition of imprisonment under the IAD were interpreted to include both actual confinement and extended supervision or parole, a prisoner sentenced to parole for life in a sending state would remain indefinitely in the sending state and would never be eligible to serve his or her sentence in the receiving state. This result is not in accord with the plain language of the IAD. *State ex rel. Otterstetter v. McManus*, 243 N.W.2d 730, 732–33 (Minn. 1976).[11]

¶ 28. The issue in *Otterstetter* was whether a penal sentence imposed by a foreign state, running concurrently with a Minnesota sentence, required the return of the prisoner to the foreign state upon his release on parole in Minnesota. *Id.* at 731. The court noted that "term of imprisonment" was not defined in the IAD, but concluded that "it is clear that the phrase is used in this section [Article III] to refer to the period of actual physical confinement of the prisoner." *Id.* at 732.

¶ 29. Pharm also contends that his status as a Nevada parolee keeps him within the IAD. We do not

---

[11] *See also United States v. Dobson*, 585 F.2d 55, 58–59 (3rd Cir. 1978) (defining "term of imprisonment" as the "definable period of time during which a prisoner must be confined in order to complete or satisfy the *prison term or sentence*") (emphasis in original); *United States v. Carnes*, 41 F. Supp. 2d 719, 722 (E.D. Mich. 1999) (stating that "[a]lthough a parolee technically continues to serve the sentence imposed by the court, he is not actually serving a term of imprisonment as required under the express provisions of the IAD"); *People v. Brown*, 854 P.2d 1332, 1336 (Colo. Ct. App. 1993) (stating "[a] parolee is not a 'prisoner' who is 'serving a term of imprisonment' ").

agree. The United States Supreme Court decision in *Carchman* supports our conclusion. In *Carchman*, the Court stated that Article III applies only to a detainer based on an "untried indictment, information or complaint," which refers to "criminal charges pending against a prisoner." *Carchman*, 473 U.S. at 725. Respondent Nash sought to invoke his rights under the IAD because his probation-revocation charges were not brought to hearing within 180 days. *Id.* at 722. The United States Supreme Court held that Article III did not apply to probation-violation detainers because a probation-violation charge is not a criminal charge pending against a prisoner. *Id.* at 734.

¶ 30. Like *Carchman*, Pharm does not have any criminal charges pending against him in Nevada; he has been paroled by Nevada. Furthermore, no detainers have been lodged in Wisconsin by Nevada against Pharm to trigger the IAD. While probation and parole are not the same, *Carchman* is instructive because Pharm has no outstanding criminal charges pending against him that could trigger an IAD detainer and that fact was significant in the Court's decision in *Carchman*. *Id.* Stated otherwise, *Carchman* concluded that all detainers do not trigger the IAD; only those detainers for untried criminal charges trigger the IAD. *Id.*

¶ 31. Other courts have also recognized that the IAD does not apply to parolees who are not incarcerated or who are confined while awaiting a parole revocation hearing. *See Hopper v. U.S. Parole Comm'n*, 702 F.2d 842, 846 (9th Cir. 1983) (holding that an adjudicated parole violator warrant is not a "complaint on the basis of which a detainer has been lodged" within the meaning of Article III); *United States v. Black*, 609 F.2d 1330, 1333 (9th Cir. 1979) (stating that when a prisoner was

released on parole and transferred to federal custody to serve an outstanding sentence, he was no longer covered by the IAD); *Dobson*, 585 F.2d at 59 (holding that a parole violator held in custody pursuant only to a parole violation does not come within the provisions of the IAD because he or she is not "serving a term of imprisonment"); *State v. Bellino*, 557 A.2d 963, 964 (Me. 1989) (holding that the IAD does not apply to parolees because they are not "prisoners serving a sentence in prison"); *Bush v. Canary*, 286 N.W.2d 536, 538 n.1 (S.D. 1979) (stating the IAD "is not applicable to detainers lodged for parole violations").

¶ 32. Pharm argues that *Snyder v. Sumner*, 960 F.2d 1448 (9th Cir. 1992), supports his assertion that the IAD applied to him after he was placed on parole by Nevada and transported to Wisconsin to begin his Wisconsin incarceration. However, we conclude that *Snyder* is not applicable. In *Snyder*, Nevada filed a detainer for pending felony charges under the IAD while Snyder was incarcerated in Iowa. *Id.* at 1450. Snyder was then transported to Nevada for trial, which did not commence for 426 days. *Id.* While Snyder was awaiting trial in Nevada, Iowa paroled him. *Id.* On appeal subsequent to his convictions of the Nevada charges, Snyder argued that Nevada had violated his right to be brought to trial within 120 days as required by the IAD, and therefore, his convictions should be overturned. *Id.* Nevada contended that once he was paroled, the IAD no longer applied. The Ninth Circuit Court of Appeals agreed with Snyder, reasoning that once the IAD's guarantees for a speedy trial attached to Snyder, which they did when he was first transferred to Nevada to stand trial, that guarantee was not changed by Snyder's subsequent parole by Iowa. *Id.* at 1453.

¶ 33. Pharm's argument that *Snyder* means the IAD continues to apply to him even after he was sent to Wisconsin to complete his sentence is not applicable because none of the IAD's guarantees to Pharm were changed by his Nevada parole. He had already been given a speedy trial in Wisconsin; he had been returned to Nevada to complete the term of incarceration Nevada sought to impose and then returned to Wisconsin for confinement. At the time of Pharm's return to Wisconsin, he had no further rights under the IAD that had not been provided. Accordingly, *Snyder* is not helpful in resolving the issues presented by Pharm's circumstances.

¶ 34. Pharm was accorded all his rights under Wis. Stat. § 976.05, which he triggered by his Request for Disposition. He was given notice that a detainer had been lodged in Nevada and he responded with a Request for Disposition. In order to meet his request, he was transported to Wisconsin to face trial for the outstanding Wisconsin charges; he was accorded a speedy trial; he was returned to Nevada until parole; and he was returned to Wisconsin after parole by Nevada. All occurrences were in accord with the IAD. *Eesley,* 225 Wis. 2d at 255 n.2.

¶ 35. Pharm also contends that Nevada had a right to his return that Wisconsin did not honor.[12] Again, we disagree. Nevada did not have any IAD right

[12] The dissent echos this claim and cites *Pitsonbarger v. Gramley,* 103 F.3d 1293 (7th Cir. 1996) to imply that such a right exists unless Nevada waives it. Abrahamson, C.J., dissenting, ¶ 65 n.11. *Pitsonbarger (vacated and remanded, Pitsonbarger v. Gramley,* 522 U.S. 802 (1997); *aff'd on reh'g, Pitsonbarger v. Gramley,* 141 F.3d 728 (7th Cir. 1998)) does not support such an

remaining after Pharm was returned to Nevada to complete his term of incarceration there. When Pharm was incarcerated in Wisconsin, Nevada could have triggered additional rights under the IAD if it had lodged a detainer in Wisconsin based on untried indictments, informations or complaints that were open in Nevada. However, Nevada has not done so. In fact, Nevada has never made any type of request that Pharm be returned to it.[13] Nevada did send periodic letters to the Wisconsin Department of Corrections while Pharm was incarcerated, but the letters requested only that Wisconsin authorities notify Nevada authorities prior to Pharm's release. Because the record shows that Nevada was aware of Pharm's pending release, we conclude Wisconsin complied with that request.

## C. Chapter 980 Proceeding

¶ 36. As part of his objections to the ch. 980 proceeding, Pharm argues that he did not knowingly waive extradition for a ch. 980 proceeding. He asserts

---

inference. In *Pitsonbarger*, Nevada had convicted Pitsonbarger of attempted homicide and other crimes of violence. *Id.* at 1296. Pitsonbarger's Nevada term of incarceration had begun, but was not completed, when he was convicted of homicide in Illinois, and Illinois imposed the death penalty. *Id.* It was at that point that the governor of Nevada waived the IAD right to the return of Pitsonbarger. *Id.* at 1300–02. In Pharm's case, there was no Nevada term of incarceration yet to be served, so there was nothing for Nevada to waive.

[13] Pharm may not have standing to assert that Nevada's rights have been violated since Nevada has not requested that Pharm be returned. However, we do not address the standing question because we conclude that Wisconsin honored all Nevada's rights under the IAD.

his waivers contemplated only criminal proceedings, and therefore, the UCEA, Wis. Stat. § 976.03, was violated.[14] The UCEA details procedures to be followed when a request for extradition has been made. No state has made a request to extradite Pharm. Such a request is a condition precedent to application of the UCEA. § 976.03(3).

¶ 37. In addition, Pharm exercised his rights under Article III of the IAD when he requested final disposition of his untried Wisconsin charges. As we explained above, Article IV is not at issue here. An Article III request for final disposition requires "a waiver of extradition with respect to any charge or proceeding contemplated thereby . . ., and a waiver of extradition to the receiving state to serve any sentence there imposed upon the prisoner after completion of the prisoner's term of imprisonment in the sending state." Wis. Stat. § 976.05(3)(e). Pharm's request for final disposition of his untried charges, using language directly from Article III, stated:

> I hereby agree that this request will operate as a request for final disposition of all untried indictments, informations or complaints on the basis of which detainers have been lodged against me from your state. I

---

[14] We note that the statutory extradition process is a right conferred upon the state "to protect its own citizens or persons within its boundaries from unjust criminal actions that may be brought by a sister sovereign state." *State ex rel. Niederer v. Cady*, 72 Wis. 2d 311, 317, 240 N.W.2d 626 (1976). A prisoner has no right to complain if a sovereign state waives its extradition rights. *Id.* at 318. Therefore, it may be that Pharm does not have standing to assert a deprivation of rights under the UCEA; however, we do not need to reach this issue since we conclude that the waiver of extradition Pharm executed is not relevant to the ch. 980 proceedings.

> also agree that this request shall be deemed to be my waiver of extradition with respect to any charge or proceeding contemplated hereby or included herein, and a waiver of extradition to your state to serve any sentence there imposed upon me, after completion of my term of imprisonment in this state. I also agree that this request shall constitute a consent by me to the production of my body in any court where my presence may be required in order to effectuate the purposes of the Agreement on Detainers and a further consent voluntarily to be returned to the institution to which I am now confined.

Accordingly, the UCEA has no relevance to the ch. 980 proceeding.

¶ 38. However, we agree that Pharm's waivers of extradition did not extend to the ch. 980 proceeding. Chapter 980 proceedings are civil in nature and Pharm's waiver was in relation to criminal charges. Nevertheless, it does not follow that Pharm's rights under the IAD preclude a ch. 980 prosecution at the conclusion of Pharm's term of incarceration. As we explained above, the IAD, including Pharm's Article III waivers, had no further application once Pharm was transported to Wisconsin to begin serving his term of incarceration. At his mandatory release date, Pharm was in no different position than any other person incarcerated in Wisconsin for a sexually violent crime that was committed in Wisconsin. That is, he could be subjected to a ch. 980 commitment proceeding if the State chose to file a ch. 980 petition. Our conclusion in this regard is no different than if Pharm had suffered another type of mental health condition during incarceration in Wisconsin that required a ch. 51 proceeding to protect him or others. The IAD waivers would not prevent those proceedings from going forward.

¶ 39. Furthermore, it is clear that Wisconsin had jurisdiction to conduct the ch. 980 proceedings. Chapter 980 may be applied to any person who has committed sexually violent offenses in Wisconsin and who is incarcerated in this state. *See State v. Burgess*, 2003 WI 71, ¶¶ 11–21, 262 Wis. 2d 354, 665 N.W.2d 124. In *Burgess*, we held that the circuit court had jurisdiction to hold a ch. 980 commitment proceeding for an enrolled tribal member incarcerated in Wisconsin for a sexually violent offense, even where the predicate criminal offense was committed on the Lac du Flambeau Reservation. *Id.* Our analysis in *Burgess* was based on Public Law (PL) 280, 18 U.S.C. § 1162, which granted Wisconsin concurrent jurisdiction over criminal offenses and certain civil claims arising on tribal land. While not directly applicable here, *Burgess* is evidence of the broad scope of Wisconsin's jurisdiction to prosecute ch. 980 proceedings. *Id.*, ¶¶ 17–19 (citations omitted).

## III. CONCLUSION

¶ 40. We conclude that neither the IAD nor Pharm's waivers of extradition under the IAD for his prosecution and incarceration by Wisconsin precluded Wisconsin from commencing a ch. 980 commitment proceeding. Pharm's rights under the IAD and its extradition waivers were fully accorded upon his return to Wisconsin to serve his outstanding criminal sentence. At that point, the IAD had no further application to Pharm. In addition, any obligations Wisconsin had to Nevada under the IAD were concluded when Pharm was returned to Nevada to complete his term of incarceration for his Nevada convictions. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 41. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). Wisconsin may very well have personal jurisdiction to commence Wis. Stat. ch. 980 proceedings against Pharm, who is physically present in Wisconsin. The traditional rule that physical presence confers personal jurisdiction is not, however, without exception in civil cases.[1] Because the majority opinion does not fully address the jurisdictional issue, I will not comment further.

¶ 42. Although it is not pertinent to a decision in this case, I feel compelled to express surprise that the State of Wisconsin wants to keep Pharm in Wisconsin as a chapter 980 sex offender when Nevada would

---

[1] *Manitowoc Western Co., Inc. v. Montonen,* 2002 WI 21, ¶¶ 8, 10, 250 Wis. 2d 452, 639 N.W.2d 726.

Case law suggests that a state may engage in all kinds of nefarious behavior to obtain personal jurisdiction over an individual to exercise criminal jurisdiction.

Under what is known as the "*Ker-Frisbie* Doctrine," courts, including the United States Supreme Court, have held that people who had been forcibly removed from a foreign jurisdiction cannot challenge an indictment or conviction on the basis that jurisdiction was obtained in violation of the constitution. In short, a state might lawfully conduct criminal proceedings against a person who was kidnapped and forcefully dragged within the state's boundaries. This doctrine is so named for the two leading United States Supreme Court decisions establishing this principle: *Ker v. Illinois,* 119 U.S. 436 (1886), and *Frisbie v. Collins,* 342 U.S. 519 (1952).

This court adopted this principle in *State v. Monje,* 109 Wis. 2d 138, 143–44, 325 N.W.2d 695 (1982), holding that even an illegal arrest does not bar the state from exercising jurisdiction to try a pending criminal charge.

otherwise exercise lifetime supervision and custody over Pharm. Wisconsin will have to pay costs in excess of $100,000 per year for Pharm's inpatient treatment as a committed sex offender.[2] The Wisconsin Legislative Fiscal Bureau reports the total expenditure of the state for services under chapter 980 as $30,371,600 for fiscal years 2003–2004.[3] Furthermore a chapter 980 commitment is in all probability a lifetime commitment for Pharm, and thus the State is committing itself to pay Pharm's institutional expenses for a long time.[4] Pharm is now about 55 years old.

¶ 43. The majority opinion, ¶ 9 n.3, obviously is concerned that Nevada and Pharm intend Pharm to spend his Nevada parole in Wisconsin. Nevada and Wisconsin are signatories to the Uniform Act (Compact) for Out-of-State Parolee Supervision, Wis. Stat.

---

[2] Jane Pribek, *Chapter 980: Part I, Finding a Home Remains a Hot Topic,* Wis. L.J., *available at* http://www.wislawjournal.com/archive/2005/0622/980.html.

[3] *See* Wisconsin Legislative Fiscal Bureau, *Civil Commitment of Sexually Violent Persons,* Jan. 2005, *available at* www.legis.state.wi.us/lfb/Informationalpapers/52.pdf.

[4] Very few chapter 980 sex offenders in the years since the enactment of chapter 980 have been released outright or released under supervision. From 1996, when chapter 980 proceedings first became an option, to 2004, approximately 280 individuals were civilly committed as sexually violent predators. Only approximately 40 were granted supervised release, and of those, approximately 15 had their supervised release revoked. Approximately 15 individuals were ultimately discharged from state custody. *See* Steve Watters, *Wisconsin's Sexually Violent Persons Law Chapter 980: Presentation to the Special Committee on Sexually Violent Commitments* (Sept. 28, 2004), *available at* http://dhfs.wisconsin.gov/sandridge/Informational%20Papers/Leg Council-Power%20Point.pdf.

§ 304.13.[5] It is not clear from the record that Pharm qualifies under the Act for Wisconsin supervision. Moreover, the provisions of the Compact contemplate preapproval by Wisconsin of the transfer of an out-of-state parolee to Wisconsin. *State v. Martinez,* 198 Wis. 2d 222, 230, 542 N.W.2d 215 (Ct. App. 1995). No such preapproval or discussion of Pharm's parole under Wisconsin supervision is part of the record.

¶ 44. In any event, I disagree with the majority opinion that the Interstate Agreement on Detainers Act (IAD) (Wis. Stat. § 976.05 (2003–2004))[6] and Pharm's waiver of extradition for criminal proceedings are not applicable to Wisconsin's prosecuting a ch. 980 action against Pharm.

¶ 45. Under the IAD and the waiver, a sending state (here Nevada) may send a prisoner to a receiving state (here Wisconsin) for a criminal trial. When the prisoner makes a request for final disposition under the IAD, "the appropriate authority in a sending state shall offer to deliver *temporary custody* of such prisoner to the appropriate authority in the state where such indictment, information or complaint is pending . . . in order that speedy and efficient prosecution may be had." Wis. Stat. § 976.05(5)(a) (emphasis added).

¶ 46. After the criminal trial in the receiving state (Wisconsin) in which conviction is entered and a prison term is imposed, the prisoner is returned to the sending state (Nevada) to finish serving the original prison sentence. Wis. Stat. § 976.05(3)(e). After com-

[5] Wis. Stat. 2003–04, vol. 5, at 919 (Appendix: Wisconsin Interstate Compacts (Active)).

[6] All references to the Wisconsin statutes are to the 2003–2004 version unless otherwise noted.

pleting the original prison term in the sending state (Nevada), the prisoner is then returned to the receiving state (Wisconsin) to serve the prison term imposed in the receiving state. Wis. Stat. § 976.05(3)(e).[7]

¶ 47. The prisoner apparently remains in the "custody" of the sending state (Nevada) even when serving the prison sentence in the receiving state (Wisconsin). Wisconsin Stat. § 976.05(5)(g) states: "For all purposes other than that for which temporary custody as provided in this agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending state [Nevada] . . . ."

¶ 48. The question posed in the present case is whether at the end of the prison term in the receiving state (Wisconsin), the receiving state (Wisconsin) must return the prisoner to the sending state (Nevada) to complete parole there, or whether the receiving state (Wisconsin) may maintain custody of the prisoner solely for civil commitment.

¶ 49. With myopic vision, the majority opinion cannot locate a provision commanding Wisconsin to return Pharm to Nevada to serve a lifetime parole following Pharm's term of imprisonment in Wisconsin. The majority opinion misses the mark. There is ample evidence that the IAD and Pharm's waiver of extradition do not imbue Wisconsin with the authority to commit Pharm civilly after he completed his Wiscon-

_____

[7] Wisconsin Stat. § 976.05(3)(e) requires that "[a]ny request for final disposition made by a prisoner under par. (a) shall also be deemed . . . a waiver of extradition to the receiving state to *serve any sentence there imposed* upon the prisoner after completion of the prisoner's term of imprisonment in the sending state" (emphasis added).

sin prison sentence, when he had an outstanding lifetime parole term in Nevada that Nevada did not waive.

¶ 50. Moreover, the purposes of the IAD expressed in the statute are undermined by the majority's interpretation. As a result of the majority opinion, the IAD becomes a device undermining certainty in a prisoner's future and a threat to the spirit of cooperation between the states that the IAD was intended to foster.

¶ 51. Finally, Wisconsin's decision to institute ch. 980 proceedings against Pharm contravenes Pharm's reasonable expectations under the waiver of extradition and the IAD.

¶ 52. For the reasons set forth, I conclude that Pharm should be returned to the Nevada authorities for lifetime parole supervision, not kept in a Wisconsin institution under indefinite ch. 980 civil commitment.

I

¶ 53. Under Pharm's extradition waiver under Wis. Stat. § 976.05(3)(e), Pharm expressly agreed (1) to waive extradition to Wisconsin with respect to any charge or proceeding, (2) to serve any sentence there imposed upon him, after completion of his term of imprisonment in Nevada, and (3) to consent voluntarily to be returned to the original place of imprisonment.

¶ 54. The waiver is limited. The majority opinion fails to give meaning to the limitations.

¶ 55. The first part of the waiver is limited to a criminal proceeding in Wisconsin. No question is presented here about this provision.

¶ 56. The second part of the waiver is limited to serving a sentence in Wisconsin. There is no waiver for any subsequent civil proceeding. No question is presented here about this provision.

¶ 57. Under the third part of the waiver, Pharm gave consent to be returned to the "original place of imprisonment." I conclude that "original place of imprisonment" should be read to refer to Nevada under the two circumstances involved in the present case: (1) return to Nevada to continue imprisonment in Nevada after trial, conviction, and sentencing in Wisconsin, and (2) return to Nevada to serve parole in Nevada after imprisonment in Wisconsin. The statutory drafting could have been better but the meaning is clear.

¶ 58. Regardless of the interpretation of the third part of the waiver, under the IAD the prisoner remains in Nevada's custody. Wisconsin Stat. § 976.05(5)(g) provides that for "all purposes other than . . . temporary custody [defined as the period during which the receiving state tries the prisoner on criminal charges][8] . . . the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending state . . . ." Furthermore, § 976.05(5)(e) provides that "at the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending state." I read these provisions as barring Wisconsin's decision to commit Pharm civilly.

---

[8] Temporary custody is defined in the IAD, Wis. Stat. § 976.05(5)(d), as follows:

The temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations or complaints which form the basis of the detainer or for prosecution on any other charge or charges arising out of the same transaction.

¶ 59. Nevada statutes[9] and case law[10] support the view that Nevada has continuing custody and jurisdiction of its parolees even when they are imprisoned in another state.

¶ 60. Nevada's conduct in the case at bar also reveals that it understands the IAD and Pharm's waiver of extradition the same way as I do. While Pharm was

---

[9] Nevada Rev. Stat. Ann. § 213.1099(3) reads in relevant part: "When a person is convicted of a felony and is punished by a sentence of imprisonment, he remains subject to the jurisdiction of the board from the time he is released on parole ... until the expiration of the maximum term of imprisonment imposed by the court ...."

Moreover, Nevada's custody interest in a parolee is not diminished when Nevada allows the parolee to go to another state. Nevada, for permissible reasons, may revoke parole and seek return of the parolee, even while the parolee is located in a prison in another state. *See* Nev. Rev. Stat. Ann. § 179.231 (expressing policy that transfer of prisoners to another state is not deemed a waiver of the right to demand their return).

[10] The Nevada Supreme Court has described parole as "not set[ting] aside or affect[ing] the sentence; the convict remains in the legal custody of the state and under the control of its agents, subject at any time, for breach of condition, to be returned to the penal institution." *Garnick v. Miller*, 403 P.2d 850, 852 (Nev. 1965) (citation omitted).

The Nevada Supreme Court has recognized a State's power to revoke a parolee's parole even when the parolee is serving a prison sentence out of state. *See Kelch v. Sumner*, 822 P.2d 1094 (Nev. 1991).

Wisconsin seems to adhere to the same principle. Wisconsin Stat. § 304.06(3) provides in relevant part: "Every paroled prisoner remains in the legal custody of the department unless otherwise provided by the department. If the department alleges that any condition or rule of parole has been violated by the prisoner, the department may take physical custody of the prisoner ...."

serving his 15–year sentence in Wisconsin, Nevada continued to assert its custody over Pharm.

¶ 61. Shortly after paroling Pharm to Wisconsin, in October 1990 Nevada sent a letter informing the Wisconsin Department of Corrections that Nevada had lifetime supervision over Pharm upon his release or transfer. The letter stated in part, "[Pharm] has been paroled to your [Wisconsin's] 'HOLD' and will remain under Nevada's parole supervision until Life. . . . Please accept this letter as a request for sixty (60) days notification prior to the subject's release or transfer. . . ."

¶ 62. Again in February 1991, Nevada reiterated its continued right to custody over Pharm through written correspondence to the Wisconsin Department of Corrections.

¶ 63. On July 23, 1997, about three months before Pharm's October mandatory release date, Nevada's written communication to the Wisconsin Department of Corrections, entitled "Hold Notify Letter," advised the Department that Pharm "has been paroled to your hold and will remain under Nevada's parole supervision for Life" and noted "it is imperative that we are notified prior to his release . . . ."

¶ 64. On August 26, 1997, Nevada corresponded directly with Pharm, advising him of his obligations to Nevada on his release from the Wisconsin prison.

¶ 65. These communications exhibit Nevada's understanding that it continued to maintain a custody interest in Pharm despite the fact that Pharm was paroled to a Wisconsin prison. In addition, the communications from Nevada demonstrate that, upon Pharm's release from prison in Wisconsin, Nevada expected to

exercise primary supervisory power over Pharm. Never did Nevada relinquish complete control over Pharm to Wisconsin.[11]

¶ 66. Unfortunately, the majority opinion fails to recognize Nevada's continued interest in its parolees. Consequently, the majority opinion never even considers that the IAD and the extradition waiver should be read in light of the sending state's continued interest, and the receiving state's subordinate interest, in the prisoner.

## II

¶ 67. My interpretation of the waiver of extradition and the IAD is supported by the purposes of the IAD and the policies informing it. Wisconsin Stat. § 976.05(9) states that the IAD "shall be liberally construed so as to effectuate its purposes." The United States Supreme Court has stated that when "the pur-

---

[11] Wis. Stat. §§ 976.05(3)(d), 976.05(3)(e), 976.05(5)(g). A state can waive its interest in a prisoner. In *Pitsonbarger v. Gramley,* 103 F.3d 1293, 1302 (7th Cir. 1996), *vacated and remanded,* 522 U.S. 802 (1997), *aff'd on reh'g,* 141 F.3d 728 (7th Cir. 1998), the Governor of Nevada specifically and explicitly waived the right to have the Nevada prisoner, Pitsonbarger, returned to Nevada. The Executive Agreement executed in accordance with the IAD stated: "IT IS ALSO AGREED that if Jimmy Pitsonbarger receives any sentence providing less than death in Missouri and the death sentence in Illinois is vacated, commuted, or otherwise permanently eliminated, he will be returned to Nevada to serve his life without possibility of parole. If one death sentence remains in effect, Jimmy Pitsonbarger will be housed in whatever state has said sentence in effect." *Id.* at 1300. In the instant case Nevada did not waive its rights for return, not after Pharm's trial in Wisconsin and not after Pharm completed his Wisconsin sentence. Nevada regularly asserted its continuing custody interest in Pharm.

poses of the Agreement and the reasons for its adoption" are implicated, there is simply "no reason to give an unduly restrictive meaning" to the Agreement's terms.[12] The majority opinion has not liberally construed the IAD to effectuate its purposes.

¶ 68. Moreover, the majority opinion has failed to look beyond a single purpose of the IAD, namely providing resolution of pending detainers, to consider what other policy interests inform the IAD and its proper interpretation. By ignoring the purposes of the IAD, the majority opinion fails to give full meaning to the text of the IAD.

¶ 69. As United States Supreme Court Justice William J. Brennan, Jr. explained, "Three distinct goals generated the drafting and enactment of the Agreement: (1) definitive resolution of potential terms of incarceration so that prisoners and prison administrators can know with certainty when a prisoner is likely to be released, (2) speedy disposition of detainers to ensure that those filed for frivolous reasons do not linger, and (3) reciprocal ease for signatory States to obtain persons incarcerated in other jurisdictions for disposition of charges of wrongdoing, thereby superseding more cumbersome extradition procedures."[13]

---

[12] *United States v. Mauro,* 436 U.S. 340, 361–62 (1978). "Since the [IAD] is remedial in character, it should be construed liberally in favor of the prisoner." *Carchman v. Nash,* 473 U.S. 716, 735 n.1 (1985) (Brennan, J., dissenting) (citing Council of State Governments, *Handbook on Interstate Crime Control* 134 (1978 ed.)).

[13] *Carchman v. Nash,* 473 U.S. 716, 737 (1985) (Brennan, J., dissenting) (citing *United States v. Mauro,* 436 U.S. 340, 359–64 (1978); Council of State Governments, *Suggested State Legislation, Program for 1957,* 74–79 (1956)).

¶ 70. These goals are codified in the text of the IAD:

Wis. Stat. § 976.05(1). ARTICLE I. The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures.

¶ 71. The first goal of the IAD, to promote certainty for the prisoner, is undermined by the majority

This court has previously discussed these three goals as only two goals. In *State v. Eesley,* 225 Wis. 2d 248, 261, 591 N.W.2d 846 (1999), for instance, this court announced that:

The IAD serves two express purposes. The first is to protect prisoners by "encourag[ing] the expeditious and orderly disposition of such [outstanding] charges [against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." Wis. Stat. § 976.05(1). The second purpose is to provide "cooperative procedures" to effectuate a more uniform and efficient system of interstate rendition. (Citations omitted.)

Whether the purposes are discussed in terms of two goals or three, the point remains that the majority opinion fails to look beyond the single goal of providing resolution of pending detainers to consider how the other policy interests inform the IAD and its proper interpretation.

739

opinion. A prison sentence of a definite length imposed by the receiving state can, as a result of the majority opinion, be turned into an indefinite civil commitment. By allowing Wisconsin to pursue indefinite civil commitments of out-of-state prisoners physically present in the state only under the IAD, the majority opinion allows the IAD to become a tool for injecting new uncertainties into a prisoner's life.

¶ 72. The third goal of the IAD, to increase cooperation between states and allow for smoother transfer of custody of out-of-state prisoners, is also undermined by the majority opinion. The majority opinion permits Wisconsin to obstruct unilaterally the return of Pharm to Nevada, impairing the spirit of cooperation among the states that the IAD intended to foster.

¶ 73. I conclude that the majority opinion's interpretation of the IAD is not a liberal interpretation and contravenes the express purposes of the IAD and the policies informing it.

### III

¶ 74. Further, Wisconsin's decision to institute ch. 980 proceedings against Pharm contravenes Pharm's reasonable expectations under the waiver of extradition and the IAD.[14] Wisconsin's sexual predator law was not

---

[14] In a colloquy with the circuit court, Pharm stated his expectations relating to the transfer and waiver of extradition. "What I'm trying to understand, what I'm trying to get everybody else to understand is I'm a Las Vegas prisoner. I was extradited here to serve out a sexual assault charge . . . . I'm supposed to be returned to my home state. You're all charging me with 980 [sic] didn't have any bearing on my intrastate [sic] compact agreement. I only agreed to come here to serve out a sexual assault charge." R. 5:6–15.

in existence when the waiver was executed and the IAD was adopted. In fact, chapter 980 was not enacted until 1994, seven years after Pharm first requested disposition of the pending Wisconsin detainer. There was no predecessor statute that would have provided legal authority for Pharm's indefinite civil commitment when Pharm effectuated his waiver.[15]

¶ 75. When Pharm requested final disposition of any pending charges in Wisconsin, he effectuated a waiver of extradition for the sole purpose of disposing with Wisconsin's detainer and Wisconsin's criminal charge, nothing more. He stated that his request "shall be deemed to be my waiver of extradition with respect to any charge or proceeding contemplated hereby or included herein, and a waiver of extradition to your state to serve any sentence there imposed upon me, after completion of my term of imprisonment in this state [Nevada]."[16]

¶ 76. Pharm's waiver did not contemplate chapter 980 proceedings or anything akin to them after Pharm served his prison term in Wisconsin.

¶ 77. In sum, Wisconsin's decision to institute ch. 980 proceedings against Pharm contravenes Pharm's reasonable expectations under the waiver of extradition and the IAD.

---

[15] Wisconsin Stat. ch. 975 did permit Wisconsin to seek a civil commitment for persons convicted of certain enumerated sexual offenses, including sexual assault of a child. However, the provisions of ch. 975 were restricted to proceedings commenced prior to 1980. The State did not have authority under this provision to civilly commit Pharm.

[16] Inmate's Notice of Place of Imprisonment and Request for Disposition of Indictments, Informations or Complaints. This form was signed by Pharm on October 10, 1987, pursuant to Wis. Stat. § 976.05(3)(e).

¶ 78. For all the foregoing reasons, I dissent.

¶ 79. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.