Stan JOHNSON, Karla Thurow,
Thomas McLaughlin, and Wisconsin Education
Association Council, Plaintiffs-Appellants,

v.

Elizabeth BURMASTER, Defendant-Co-Appellant,

NORTHERN OZAUKEE SCHOOL DISTRICT, Northern
Ozaukee School District Board of Education,
Jeffrey M. Lallensack, and Walter Clarke,
K12 Inc., Defendants-Respondents,†

Mark GUNDRUM and Mary Gundrum, and their
children, J. G. and B. G., Stephen McManus and
Moira McManus, and their child, K. M., Joel
Jensen and Carrie Jensen, and their child, N. J.,
Scott Kulla and Mary Kulla, and their children,
C. K. and G. K., Thomas Magnor and Mary
Magnor, and their children, A. M., B. M. and E.
M., Brion Collins and Jennifer Collins, and their
child, E. C., Daniel Fritz and Jennifer Fritz, and
their child, M. F., Jeffrey A. Morris and Louise J.
Morris, and their child, J. M., Mark M. Mejac and
Marie Mejac, and their child, P. M.,
Intervening Defendants-Respondents.†

Court of Appeals

*No. 2006AP1380. Oral argument October 30, 2007.*
*—Decided December 5, 2007.*

† Petition to review denied 4/14/08.

2008 WI App 4

(Also reported in 744 N.W.2d 900.)

215

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of and oral argument by *Lucy T. Brown* of *Wisconsin Education Association Council* of Madison.

On behalf of the defendant-co-appellant, the cause was submitted on the brief of *Peggy A. Lautenschlager*

and *J.B. Van Hollen,* attorneys general, and *Paul L. Barnett,* assistant attorney general. There was oral argument by *Paul L. Barnett.*

On behalf of the defendants-respondents, the cause was submitted on the briefs of *Alyson K. Zierdt* of *Davis & Kuelthau, S.C.,* Oshkosh, and *Jay P. Lefkowitz, Michael D. Shumsky, Jeffrey B. Wall,* and *Derek S. Bentsen* of *Kirkland & Ellis, LLP,* Washington, D.C. There was oral argument by *Jay Lefkowitz.*

On behalf of the intervening defendants-respondents, the cause was submitted on the briefs of and oral argument by *Michael D. Dean* of *Michael D. Dean, LLC,* Waukesha.

A nonparty brief was filed by *Christopher C. Mohrman* of *Michael Best & Friedich, LLP,* of Milwaukee, for the Wisconsin Coalition of Virtual School Families, Inc.

A nonparty brief was filed by *William M. Conley* and *John D. Myer* of *Foley & Lardner, LLP,* of Madison for Cooperative Educational Service Agency #9.

Before Brown, C.J., Anderson, P.J., and Nettesheim., J.

¶ 1. BROWN, C.J. Wisconsin Virtual Academy (WIVA) is a charter school established by the Northern Ozaukee School District. Though WIVA's administrative offices are within district boundaries in Fredonia, it serves pupils across the state by providing curricular materials to them in their homes via internet and mail. WIVA employs several certified teachers who also live throughout the state and have email, telephone and some internet-based contact with the pupils. However, primary day-to-day responsibility for implementing the pupils' education resides with the pupils' parents. Thegreat bulk of WIVA's funding comes from open-

217

enrollment transfer payments to the District from the pupils' home districts.

¶ 2. This appeal calls on us to determine whether the District's operation of WIVA comports with Wisconsin's charter school, open-enrollment, and teacher licensing statutes. The relevant provisions of these statutes prohibit a school district from operating a charter school located outside the district, require that open-enrollment students attend a school in the district, and require that teachers in all public schools, including charter schools, be state-certified. For each statute, the District presents a creative reading allowing WIVA to continue its present operations, but our job is not to bend the statutory framework to fit WIVA. If, as its proponents claim (and its opponents dispute), WIVA has hit upon a bold new educational model that educates pupils in a way equal to traditional school at a fraction of the cost, then the legislature may well choose to change the law to accommodate WIVA and other schools like it. However, as the law presently stands, the charter school, open-enrollment, and teacher certification statutes are clear and unambiguous, and the District is not in compliance with any of them. We reverse the circuit court's grant of summary judgment and instead direct that summary judgment be granted to the plaintiffs.

¶ 3. The essential facts are undisputed.[1] In 2003, the District contracted with K12 Inc., a Delaware

---

[1] As the circuit court noted, the proceedings below generated a "flurry of submissions" including thousands of pages of depositions and exhibits. Though there is some suggestion in the briefs that material facts are in dispute, particularly regarding whether WIVA parents are functioning as teachers, our review of the record has convinced us otherwise. The parties do not differ over the tasks that the parents perform, but rather advance competing characterizations of those tasks as either "teaching" or "supporting" the certified teachers.

corporation, to provide a curriculum for its new virtual charter school, WIVA. K12 sends books and other materials to the students, and also provides curricular materials via the internet (it also provides loaned computers). The WIVA students, under the direction of their parents,[2] study the materials and complete various assignments to demonstrate their understanding. The parents are provided with instructor's materials to assist the student's learning. The parents check the students' work on their assignments to determine whether the students have mastered the topic. A parent is required to devote four to five hours per day to the student's education. The overwhelming majority of WIVA's 619 students (as of December 2004) live and study outside the District. The open-enrollment payments transferred from these students' home districts cover the District's costs to operate WIVA and provide the district with an "oversight fee." The remaining revenue is paid to K12.

¶ 4. WIVA's principal, vice-principal, and other administrators work at the District's office in Fredonia. WIVA's certified teachers are employees of the District, but they work from their homes across the state. They review samples of students' work to assess progress, and hold one to two twenty- to thirty-minute telephone conferences per month with each student and parent, during which they discuss and assess student progress. They correspond with students via email, and respond to parental requests for assistance via email and telephone. Certified teachers also conduct thirty- to forty-

---

[2] A small minority of WIVA students were supervised in their education by an adult other than a parent; this opinion will include these adults in the term "parents." Likewise, though a pupil's day-to-day schooling activities may occur in any remote location, we will use "home" as a shorthand.

minute interactive online classes using online conferencing software; students participate in such classes two to four times per month.

¶ 5.   In January 2004, individual citizens and the Wisconsin Education Association Council (collectively "WEAC") filed suit against the District, its officials and school board, and K12 (collectively "the District"), along with State Superintendent of Public Instruction Elizabeth Burmaster. WEAC claimed that the District's operation of WIVA violated the open-enrollment, charter school, and teacher licensing statutes. Though formally a defendant, Burmaster has adopted WEAC's position on the teacher licensing statute and takes no position on the other two claims. All parties moved for summary judgment, but before these motions could be decided, a group called Children and Parents of Wisconsin Virtual Academy ("the Families") moved to intervene as defendants. The circuit court allowed them to intervene and they moved for summary judgment as well.

¶ 6.   In March 2006, the circuit court granted summary judgment to the District on all claims. WEAC and Burmaster appealed, and we certified the case to our supreme court. *See Johnson v. Burmaster*, No. 2006AP1380 (WI App July 3, 2007). The supreme court rejected our certification, and we held oral argument. For the reasons that follow, we now reverse the circuit court's grant of summary judgment to the District, and direct that it grant summary judgment to Burmaster and WEAC.

¶ 7.   In reviewing a grant of summary judgment, we apply the same standard as the circuit court and our review is de novo.[3] *Green Spring Farms v. Kersten*, 136

---

[3] Burmaster argues that we should give great deference to her interpretation of the teacher licensing statute. This is

Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). Summary judgment may be had when there are no genuine issues of material fact and one party is entitled to a judgment as a matter of law. Wis. Stat. § 802.08(2) (2005–06).[4] A court may not find disputed facts on summary judgment, *Kelly v. Clark*, 192 Wis. 2d 633, 646, 531 N.W.2d 455 (Ct. App. 1995); *Kohn v. Darlington Community Schools*, 2005 WI 99, ¶ 11, 283 Wis. 2d 1, 698 N.W.2d 794, but where the material facts are undisputed and only questions of law remain, judgment is appropriate.

■

¶ 8.    This case calls on us to interpret three statutory provisions. In construing statutes, we first look to see whether the statute has a plain and unambiguous meaning. *State ex rel. Pharm v. Bartow*, 2007 WI 13, ¶ 16, 298 Wis. 2d 702, 727 N.W.2d 1. If it does, our inquiry ceases and we apply that plain meaning to the

incorrect. The teacher licensing issue in this case is clearly one of first impression and the Department of Public Instruction's interpretation has been inconsistent, as is clear from the fact that it adopted its present understanding of the rule only in the course of this litigation. *See UFE Inc. v. LIRC*, 201 Wis. 2d 274, 285, 548 N.W.2d 57 (1996). We do not defer to an agency's litigating position. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988). We also note that, though Wis. Stat. §§ 118.001 and 120.13 (intro.) require broad construction of the statutory duties and powers of a school board, a school board's discretion remains limited to acts not contrary to state or federal law. *See* § 118.001. That which is not prohibited may be allowed, as the District argues, but that does not answer the question of what is prohibited. *See Pritchard v. Madison Metro. Sch. Dist.*, 2001 WI App 62, ¶ 16, 242 Wis. 2d 301, 625 N.W.2d 613 (finding school board discretion to offer benefits where there was no statutory prohibition of such benefits).

[4] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

facts without considering extrinsic sources of meaning, such as legislative history. *Id.* Burmaster and the District each advance legislative history arguments based primarily on various bills that never became law. Even if these bill histories were probative of legislative intent, we would not consider them because we conclude below that each of the statutory provisions at issue has a plain and unambiguous meaning.

¶ 9. We first consider whether the District has complied with WIS. STAT. § 118.40(3)(c), which states that "[a] school board may not enter into a contract for the establishment of a charter school located outside the school district." As noted above, WIVA has administrative offices within the district; however, the large majority of its teachers and students live outside the district and do not enter the district to go to school. The circuit court held that WIVA is located at the address of its administrative offices.

¶ 10. This view has the virtue of simplicity, but we cannot adopt it because it ignores the plain language of the statute. WISCONSIN STAT. § 118.40(3)(c) restricts the location of a "charter school" to the boundaries of the establishing district. Surely, the administration of a school is a part of that school, and so we have no problem agreeing that *part* of WIVA is "located" in Fredonia where the principal, vice-principal, and secretary work. But to agree with the circuit court's conclusion and hold WIVA in compliance with § 118.40(3)(c), we would have to accept that a school consists *only* of its administrators and that where the teachers teach and the students learn has nothing to do with where the school is "located." We cannot believe that the plain and ordinary meaning of the statutory term "school" *excludes both teachers and students*. The large majority of

WIVA students receive their educations at locations outside of the district, from teachers working at locations outside of the district. The conclusion is inescapable that WIVA is located, in part, outside of the district.

¶ 11. Nevertheless, the District and families urge us to reject this conclusion because, they say, it leads to absurd results. They find it impossible to accept that WIVA is "located" in many different places and that its location may change as its students come and go. As the circuit court reasoned:

> [U]nder this interpretation, WIVA has no set location. Its location would depend on where its students were logging on to the internet. WIVA would not have one set location but rather many and the location could possibly vary from day to day. Indeed, under such an interpretation, one would have to conclude that WIVA exists in cyberspace only. Thus leading to patently absurd results.

¶ 12. Simply put, we find no absurdity in the notion that WIVA is, under the statute, "located" in more than one place. In fact, the idea of a school with multiple, fluid locations flows directly and inevitably from the idea that a collection of administrators, teachers, and pupils scattered over thousands of square miles and connected only by mail, telephone and internet can be called a "school."[5]

---

[5] Our understanding of the meaning of "located" does not, as the District claims, mean that even a more traditional, "bricks-and-mortar" charter school violates Wis. Stat. § 118.40(3)(c) every time a class takes a field trip or a sports team plays an away game. The statute forbids only "the establishment" of a charter school outside of the establishing board's district, not the occasional foray over district lines. Nor does it

¶ 13. Nor is it reasonable to say that WIVA exists only in cyberspace or make the related claim that "geography-based conceptions" like "location" have been rendered meaningless.[6] First, as a matter of law, "located" is a statutory term, and we may not lightly nullify it. Second, as a matter of common sense, the rise of the internet notwithstanding, "location" remains a meaningful and often indispensable concept, particularly when it comes to the relationships between governmental units.[7] The Northern Ozaukee School District has boundaries. WIVA's students are educated by WIVA's teachers outside of them. WIVA is thus in violation of WIS. STAT. § 118.40(3)(c).

¶ 14. We next consider WIS. STAT. § 118.51, the full-time open-enrollment statute. It allows a pupil to attend a public school outside his or her home district, and sets forth the procedures the pupil and the sending and receiving district ("resident" and "nonresident"

result in a conflict with WIS. STAT. § 118.51(13), which forbids discrimination against nonresident pupils. That statute, by its terms, comes into play only when a pupil is attending school in another district; it does not, as the District would apparently have it, require that any and all students be accepted for open enrollment.

[6] Though WIVA pupils spend a few hours per month taking interactive online classes, the vast majority of the schoolwork is done the old-fashioned way, at a table or desk with pencil and paper. Thus, even accepting that some institutions are located in "cyberspace" does not require one to accept that this is where WIVA is located.

[7] As an illustration, we are using networked computers to draft this opinion. Our administrative headquarters is in Madison, *see* WIS. STAT. § 752.05, but nevertheless we feel confident that we are in the District II chambers, "located" in Waukesha, as the statutes prescribe. *See* WIS. STAT. § 752.15.

school district) must follow. The parties dispute whether a nonresident pupil enrolled in WIVA triggers the open-enrollment statute's provisions, including a shift in funding from the resident school district to the Northern Ozaukee School District. The disagreement boils down to whether a WIVA pupil "attends school" in the District.

¶ 15.   The parties skirmish over the precise language of the disputed phrase as it is used throughout WIS. STAT. § 118.51. It is rendered variously as "attend a public school . . . in a nonresident school district" (§ 118.51(2)), "attend public school in the school district" (§ 118.51(10)) and "attend school in a nonresident school district" (§ 118.51(4)(a)6.). The District contends that the presence of the article "a" in some formulations means that the phrase "in a nonresident district" modifies "public school" rather than "attend," meaning that a student need not be physically present "in the district" so long as the student "attends a school" that *is* physically present in the district. In reply, WEAC points out that if this is true, the absence of "a" in other formulations indicates the opposite, that a student must "attend" (and thus be physically present in) the district. WEAC further argues that the only reasonably applicable dictionary definition of the word "attend" is "to be present at."[8] The District responds that it is common, in modern parlance, to speak of those who participate in distance learning as "attending" the institutions from which they receive their educations.

■

¶ 16.   In our view, the presence or absence of the indefinite article and the precise shade of meaning of "attend" are not determinative. We have already ex-

---

[8] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 140 (1993).

plained that WIVA is, in part, located outside the district, and so it is of no import whether the statute requires a student to be in the district attending school or merely to attend a school that is in the district. WIVA's nonresident pupils attend school outside the district. They also attend *a* school outside the district. This is true whether one gives a broad or constricted meaning to the verb "attend."

¶ 17. The final question we must answer is whether WIVA violates Wisconsin's teacher licensure requirement. Burmaster and WEAC contend that WIVA's parents serve as the school's teachers and that because they are not licensed by the Department of Public Instruction (DPI), WIVA violates Wis. Stat. § 118.19(1), which requires that "[a]ny person seeking to teach in a public school, including a charter school . . . shall first procure a license or permit from the department."

¶ 18. The word "teach" is undefined in Wis. Stat. § 118.19, but DPI has promulgated a definition at Wis. Admin. Code § PI 34.01(59) (June 2004)[9]:

> "Teaching" means improving pupil learning by planning instruction, diagnosing learning needs, prescribing content delivery through classroom activities, assessing student learning, reporting outcomes to administrators and parents and evaluating the effects of instruction.

The circuit court accepted as fact a description of the WIVA parents' role found in a WIVA slide show: "fulfillment of attendance requirements, continuous progress with the K-12 curriculum, participation in regular teacher conference calls, monthly submission of student's work samples, and participation in State test-

---

[9] All references to the Wisconsin Administrative Code are to the June 2004 version.

ing programs." The court held that the activities of WIVA parents fall outside the activities described as "teaching" in § PI 34.01(59). WEAC and Burmaster protest that the WIVA slideshow does not present an accurate portrayal of the WIVA parents' activities. They rely on various record entries to demonstrate that a WIVA parent performs activities that are undeniably teaching: leading the student through a lesson plan, answering questions and assessing student progress.

¶ 19.  Neither we nor the circuit court have the power to find disputed facts on summary judgment, however, we agree with the circuit court that this issue does not require the resolution of a genuine issue of material fact. The differences between the parties' descriptions of a WIVA parent's role are of emphasis rather than substance. The District has nowhere disputed that a parent works one-on-one with a pupil, presenting the lesson, answering questions, and assessing progress. Instead, it simply highlights other parental tasks. Even accepting the District's description of the parent's role (which, again, is not necessarily inconsistent with the description proffered by WEAC and Burmaster), we have no difficulty concluding that the activities of the WIVA parents fall within the DPI definition (or any reasonable definition) of "teaching." Indeed, we have a difficult time understanding what else it could mean to say that a WIVA parent is responsible for "continuous progress through the curriculum."

¶ 20.  However, the District proposes that even if WIVA parents engage in "teaching," the licensure statute applies only to "professional teachers"—the employees of a public school. The argument is essentially that a "teacher" is generally understood to be a professional

employed to teach and, thus, the statute does not regulate WIVA's parents, even if they serve the same role as teachers, because they are not paid. In our view, this proposed definition wrongly elevates a *common characteristic* of a teacher into the *definition* of a teacher. To be sure, in the ordinary school, teachers are professionals employed by a public school district. Pay and professional status both come with the responsibility for teaching students in the public schools. It does not follow, though, that paid status is essential to the plain meaning of "teach in a public school." If, as here, a public school gives the duties of teaching to an unpaid, unlicensed nonprofessional, this does not mean that those duties cease to be "teaching." It is not the case, as the District claims, that professional licensure is the one key feature that distinguishes a teacher from a teacher's aide, volunteer, tutor, coach, or parent—it is the statutorily recognized job that a teacher does. To accept the District's argument—teaching requires a license, but anyone without a license is not teaching— would be to render the statute meaningless.[10]

---

[10] Nor do the other statutory provisions cited by the District support the claim that only those who are paid are "teaching" and thus subject to licensure. In fact, some detract from this argument. Wisconsin Stat. § 118.21 and Wis. Admin. Code § PI 8.01(2) both function to forbid the employment of non-authorized persons as teachers. The fact that a district may hire only licensed teachers does not show that the district may engage unlicensed teachers so long as they are not paid. Wisconsin Stat. § 118.22(1)(b), by its terms, defines "teacher" only for § 118.22, and further defines "teacher" in part as one "who holds a teacher's certificate or license"—a definition which would make nonsensical the license requirement in Wis. Stat. § 118.19, rendering it as:  "Any [person who holds a teacher's certificate or license] shall first procure a license . . . ." Wisconsin Stat. § 40.02(55) (whose definition is incorporated into the

228

¶ 21. The Families similarly urge that the only question under WIS. STAT. § 118.19(1) is whether the teachers *employed* by the District to teach at WIVA are licensed, as they undisputedly are. They argue that "WIVA's legality (or that of any other school) turns on whether teachers are performing *their* statutory functions, *not* what parents do in addition." But this argument is belied by the statute. It does not require *some* of the teachers in a public school to be licensed, but *all* of them. *See* § 118.19(1).

¶ 22. We finally address the District's claim that if WIS. STAT. § 118.19(1) does not accommodate WIVA's educational structure, all public schools violate the statute. The District points to teacher aides, parent volunteers, guest speakers, and others who may perform some of the same "teaching" functions in the public schools that parents do in WIVA. The District proposes that there is no reasonable distinction between WIVA and a more traditional public school in which unlicensed individuals play a role in the teaching of students.

¶ 23. We acknowledge that the statute, as it is written, is capable of being read to produce this absurd result. It is quite common for a statute to state a broad rule that must be tempered and clarified in its implementation—and this is exactly the role that administrative rule making by agencies like DPI is meant to play. It is obvious that the legislature does not intend to forbid guest speakers and the like by the teacher

---

administrative code at WIS. ADMIN. CODE § PI 34.01(58)) defines "teacher" for the purposes of the public employee trust fund, and requires that a "teacher" work "for compensation." Obviously, someone who is not an employee is unlikely to be included in the state's pension benefit plan; and the fact that the legislature felt the need to add "for compensation" suggests that it recognized the possibility that someone not paid by a district might still be a teacher.

certification statute, but this does not mean that we can read the statute out of existence. Perhaps the legislation simply has not caught up with the times and technology. If the statutes need to be updated to deal with new realities, it is up to the legislature, and not the courts, to update them.[11]

¶ 24. We wish to emphasize that the issue in this case is not simply what the parents do, but what the school *requires* them to do in order for the school to function. We underscore that no one is suggesting that a parent assisting his or her child to whatever extent the parent finds necessary is "illegal." The question is not whether and how a parent may assist his or her child with schoolwork; rather, it is whether the District can establish a public school, using public funds, that relies upon unlicensed individuals as the primary teachers of the pupils. The problem is not that the unlicensed WIVA parents teach their children, but that they "teach in a public school."

¶ 25. And we are convinced beyond doubt that the activities of the WIVA parents constitute "teaching in a public school." Despite this, we are not without misgivings about the decision that this fact compels. The Families protest that they are more than competent to play the role that WIVA requires of them. They also point to our state's long record of educational innovation. But our role in this case is not to weigh public policies, it is to interpret the statutes. We express no opinion on the merit of WIVA's educational model, or on

---

[11] *See* Rick Esenberg, *A Court Unbound? The Recent Jurisprudence of the Wisconsin Supreme Court,* 1 (March 2007), http://www.fed-soc.org/doclib/20070329_WisconsinWhitePaper-.pdf ("[Judges practicing judicial restraint] will not feel compelled to 'solve problems' that the political branches have 'ignored' or to 'update' the statutes.")

the relative competencies of licensed teachers and dedicated parents to recognize and make the most of "teachable moments." WIVA may be, as its proponents claim, a godsend for children who would not succeed in more traditional public schools, as well as a welcome new option for parents who want their children to receive a home-based education for any number of reasons. But it is also a public school operated with state funds, and its operation violates the statutes as they now stand. It is for the citizens of this state, through their elected representatives in the legislature, to decide whether and how their tax money is going to be spent. If the citizenry wants tax money spent on virtual schools like WIVA, that is fine. Let the citizens debate it and set the parameters, not the courts.[12]

¶ 26. We conclude that the plaintiffs are entitled to summary judgment. On remand, we direct that the circuit court enter a declaratory ruling that the District and K12 are in violation of WIS. STAT. §§ 118.19, 118.40 and 118.51, and enjoin the DPI from making pupil transfer payments based upon nonresident students enrolled in WIVA.

*By the Court.*—Order reversed and cause remanded with directions.

---

[12] It might be argued that the WIVA is simply a different form of charter school. The language of the statutes makes clear, however, that the legislature simply did not envision a virtual school like WIVA when promulgating them. When the legislature has a vision, it acts on that vision after substantial citizen input, to wit: the Milwaukee parental choice program, WIS. STAT. § 119.23; full-time open-enrollment, WIS. STAT. § 118.51; and charter schools as they are generally perceived, WIS. STAT. § 118.40.